James HUDLER, et al., Plaintiffs,

v.

Richard H. AUSTIN, in his official capacity as Secretary of State, and Bernard J. Apol, in his official capacity as Director of Elections and Secretary of the State Board of Canvassers for the State of Michigan, Defendants.

Stephanie ALLAN et al., Plaintiffs,

v.

Richard AUSTIN, Individually and in his official capacity as Secretary of State, et al., Defendants.

Civ. Nos. 6–71189 and 6–71249.

United States District Court,
E. D. Michigan, S. D.

Aug. 18, 1976.

Richard Durant, Detroit, Mich. for plaintiffs Hudler, and others.

Ronald Reosti, and Diane Middleton, Detroit, Mich., for plaintiffs Allan, and others.

Varda N. Fink, State Atty. Gen. Office, Lansing, Mich., for defendants.

Before ENGEL, Circuit Judge and GUY and FEIKENS, District Judges.

## OPINION

GUY, District Judge.

Plaintiffs in this action challenge the constitutionality of certain of Michigan's election statutes, i. e., M.C.L.A. § 168.685 and §§ 168.560a and 168.560b, providing for the qualification of "new" parties for general election ballot positions. "New" parties are those parties who either failed to run candidates for office in the last state-wide election or whose principal candidate failed to obtain 1% of the total number of votes cast for the successful candidate for Secretary of State in such election. M.C.L.A. § 168.-560a.

Prior to the passage of the challenged sections, the Michigan election law only required that "new" parties, to qualify for ballot position, must submit petitions bearing the signatures of registered electors equivalent to not less than 1% nor more than 4% of the vote received by the successful candidate for Secretary of State at the last election. Plaintiff political parties have consistently satisfied this requirement through 1976.

In April of 1976, the Michigan legislature passed Public Act 94 (M.C.L.A. § 168.685 and §§ 168.560a and 168.560b) providing, in addition to the petition requirement, that new parties must receive a vote total of three-tenths of 1% of the total number of voters appearing at the primary as shown by the poll books. A separate column or row on the primary election ballot is to list the names of those parties having met the petition requirement following the statement, "I desire that the party indicated shall have its name, party vignette, and

candidates listed on the next general election ballot." M.C.L.A. § 168.560b(1), (2), (4). Thus, a voter at the primary may vote for the candidates of any one party listed on the ballot *or* indicate a desire for a ballot position for a "new" party and its candidates at the next general election. M.C.L.A. § 168.560b(3).

Plaintiffs challenge Public Act 94 as (1) impermissibly burdening the right of individuals to associate for the advancement of political beliefs and the right of effective franchise secured by the First and Fourteenth Amendments, (2) as violative of the equal protection clause of the Fourteenth Amendment resulting in invidious discrimination against new parties and their supporters, and (3) as contravening the due process clause of the Fourteenth Amendment in that Act 94 was imposed after plaintiffs, or at least some of them, had completed or nearly completed gathering petitions under the previously existing statutory requirements and so close to the primary date as to effectively deprive them of the opportunity to apprise the voting public in general, and their supporters in particular, of the necessity of primary election support if the "new" parties in question are to appear on the November general election ballot.

## I.

The First Amendment's protection of the right of franchise is "a fundamental political right because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886). It has clearly been recognized, however, that each state has a legitimate interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies, and is not constitutionally obligated to provide instantaneous access to the ballot. *Jenness v. Fortson*, 403 U.S. 431, 432, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1973).

Indeed, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), a leading case dealing with this general subject, noted that at least 42 of the states impose on "new" parties a petition requirement similar to that which has existed as part of the Michigan law. *Id.* at 33n, 89 S.Ct. 5. These exercises of legislative power are based on Article 1, Section 4, Clause 1 of the Constitution authorizing the states to prescribe "[T]he Times, Places, and Manner of holding Elections for Senators and Representatives." The mere existence of restrictions on ballot access, therefore, raises no issue of validity unless they violate prohibitions elsewhere in the Constitution. *Williams, supra,* 393 U.S. at 29, 89 S.Ct. 5.

In setting forth the standard against which access to the ballot restrictions should be tested, the majority in *Williams* indicated that any restrictions on such fundamental rights as are involved here would receive *strict scrutiny*, and that the burdens placed upon the rights of franchise and association could only be sustained if justified by a "compelling state interest." 393 U.S. at 31, 89 S.Ct. 5.

Although striking down the Ohio election laws involved as an "entangling web" which "made it virtually impossible for a new political party . . . to be placed on the state ballot . . .", the court, as pointed out in Justice Warren's dissent, gave little guidance to either the states or other courts as to what constitutes a reasonable ballot regulation. 393 U.S. at 69–70, 89 S.Ct. 5.

Both the dissent and the majority in *Williams* agree that a state can condition ballot regulation "upon at least three considerations—a substantial showing of voter interest in the candidate seeking a place on the ballot, a requirement that this interest be evidenced prior to the election, and a party structure demonstrating some degree of political organization." 393 U.S. at 70, 89 S.Ct. at 31.[1] The application of the "strict scrutiny" test and its interrelation

---

1. Although the above quoted language is from Justice Warren's dissent, it is that portion of his dissent in which he indicates *agreement* with the majority on the above enumerated principles.

with legitimate state purposes in regulating ballot access has been elaborated upon and qualified in other Supreme Court cases.

"The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. *McDonald v. Board of Election*, 394 U.S. 802 [89 S.Ct. 1404, 22 L.Ed.2d 739] (1969). [The filing fee statute at issue] does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, [the filing fee statute] creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny. Compare *Jenness v. Fortson*, 403 U.S. 431 [91 S.Ct. 1970, 29 L.Ed.2d 554] (1971), with *Williams v. Rhodes* [supra]. In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1971).

■ Although there appears to be a variance among the decided cases as to when the "strict scrutiny" standard is to be applied, it is clear that in all the cases dealing with this subject there is a balancing of the burden of the restrictions against the interest of the state in their promulgation.

*American Party of Texas v. White*, 415 U.S. 767, 780, 94 S.Ct. 1296, 1305, 39 L.Ed.2d 744 (1973) notes:

"[W]hether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations against parties not polling 2% of the last election vote, their validity depends upon whether they are necessary to further compelling state interests."

*Storer, supra*, 415 U.S. at 729, 94 S.Ct. at 1278, states with reference to Ohio's statutes at issue in *Williams*:

"Because these restrictions, which were challenged under the Equal Protection Clause, severely burdened the right to associate for political purposes and the right to vote effectively, the Court, borrowing from other cases, ruled that discriminations against new parties and their candidates had to be justified by compelling state interests."

See also *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Mogk v. City of Detroit*, 335 F.Supp. 698 (E.D.Mich. 1971) (three-judge court).

■ *Williams'* assessment of the constitutional impact of the burden imposed by Ohio's challenged election law was that it made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties." 393 U.S. at 25, 89 S.Ct. at 8. Although the facts in this case do not support such a conclusion with respect to Act 94, the court does conclude that strict scrutiny is called for in the examination of the challenged Michigan statute because the candidate restrictions at issue have a real and appreciable impact on those citizens and voters who organized and support the "new" parties bringing this action and constitute a "substantial" burden on their rights to associate and exercise an effective franchise. Petition signatures in excess of 175,000 have been submitted for the 1976 election on behalf of the seven new parties at bar. Unless the .3% primary performance requirement for ballot qualification is now satisfied, the candidates of those "new" parties will be denied a position on the general election ballot in November. In balancing these "substantial burdens" against the "compelling state interest," the following principles are helpful.

■ First, imposition of even substantial restrictions on the right to vote or associate does not automatically invalidate the statute which has that effect. *Storer, supra*, 415 U.S. at 729, 94 S.Ct. 1274. Although the court in *Storer* found a substantial burden to be imposed by the state statute, the court concluded, in part, that California's six month disaffiliation requirement for in-

dependent candidacies "furthered a compelling interest" and was an "essential part of its overall mechanism to achieve its acceptable goals." *Id.* at 736, 94 S.Ct. at 1282.

█ Second, the balancing of "substantial burden" against "compelling state interest" is largely a matter of degree.

"[T]he rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree,' *Dunn v. Blumstein* [, *supra*, 405 U.S. 330 at 348, 92 S.Ct. 995, at 1006, 31 L.Ed.2d 274 (1971)], very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those disadvantaged by the classification.' *Williams v. Rhodes, supra,* [393 U.S.] at 30 [89 S.Ct. 5, at 10]; *Dunn v. Blumstein, supra,* [405 U.S.] at 335 [92 S.Ct. 995, at 999]." *Storer, supra,* 415 U.S. at 730, 94 S.Ct. at 1279.

The "matter of degree" test can be further illustrated by comparing, for example, *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), (11 month waiting period after changing parties held necessary to prevent inter-party raiding) with *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), (23 month waiting period not valid); and *Dunn v. Blumstein, supra,* (one year residency requirement unreasonable) with *Marston v. Lewis,* 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1972), (50 days upheld).

Applied to the facts in this case, the state interest standard requires this court to answer two questions: first, whether Michigan's interest underlying the passage of Public Act 94 is "compelling", and second, whether Act 94 is "necessary" to further that interest.

Looking first to the "facts and circumstances behind the law," it is appropriate to review the results in Michigan's recent elections conducted under the former statute requiring only 1% petition support to obtain ballot status. In 1968, two of the plaintiff new parties at bar and four new parties in total ran candidates. The principal candidate of only the American Independent Party polled votes in excess of the minimum number of petition signatures required to be submitted, thereby qualifying for automatic ballot status. In 1970, the same two plaintiff new parties which ran candidates in 1968 again ran a slate of candidates and again received substantially fewer votes than the number of signatures submitted. In 1972, four of the plaintiff new parties and five new parties in all ran slates of candidates and the principal candidate of only two, one being the plaintiff Human Rights Party, polled votes in excess of their petition support. In 1974, four new parties (all plaintiffs at bar) ran slates of candidates, and the principal candidate of none polled votes equivalent to the number of petition signatures necessary to retain ballot status. Of the remaining new parties, the party polling the most votes at each election received only a fraction of the petition support it had submitted. (Approximately 35% in 1968, 16% in 1970, 20% in 1972 and 11% in 1974).

It would thus appear that the petition signatures do not accurately predict the actual voting patterns of those who sign. Indeed, plaintiffs' expert on voter behavior, Dr. Warren, conceded that signatures on petitions, such as Michigan uses, possess no particular validity as an index of follow-up support at the general election and are admittedly somewhat unreliable. Dr. Warren's testimony indicated that the factor that petition signatures accurately measure is the willingness to give new parties a "chance" to appear on the ballot rather than actual support.

Preparations for the 1976 election indicated that six of the plaintiff parties at bar would seek ballot status via petitions, and in addition, the Human Rights Party, the American Independent Party, and the Democratic and Republican Parties would quali-

fy for automatic placement, totalling a minimum of ten parties qualifying for ballot status. In addition, plaintiffs state as a fact that eleven parties may have had intentions to seek ballot status in the 1976 general election. *Williams v. Rhodes, supra,* striking down a statutory scheme which perpetuated a virtual monopoly by the two major parties noted:

"It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but in Ohio at the present time this danger seems to us no more than *'theoretically imaginable.'* " (Emphasis added)

Conversely, the facts and circumstances which perpetuated the passage of Act 94 appear to pose an existing danger which is neither remote nor conjectural.

Defendant Apol, State Director of Elections, testified that Michigan's voting machines have a nine-party capacity and the only feasible ways a ballot having greater than that number could be accommodated would be by paper ballots, two machines for each voter, or punch cards if the new parties ran limited slates. He stressed that paper ballots, although currently in use, are an extremely cumbersome method utilized only in a few of Michigan's smaller counties and accounted for only 5.7% of the 1974 returns. Defendant Apol further testified that the large scale use of paper ballots would over burden and clog the state's election machinery and that the number of parties, candidates and offices involved would cause voter confusion and delay. His testimony also indicated that there is no voting machine available on the market with the capacity to handle more than nine parties and still provide the straight party ticket option that Michigan law mandates. See M.C.L.A. § 168.705 (paper ballots), § 168.775 (voting machines), § 168.795 (electronic voting machines). In response to plaintiffs' assertion that the "Ransom-Shoup" machine has a capacity in excess of nine parties as evidenced by its use in certain other states, Mr. Apol indicated that the Ransom-Shoup machine cannot be used in Michigan because it cannot handle the number of *offices* to be voted upon at the general election.

The facts and circumstances underlying the passage of Public Act 94 may be summarized as follows: (1) over a ten-year period, the petition requirement for ballot access, standing alone, proved to be an imprecise tool for measuring true voter support; and (2) in 1976, more new parties sought to qualify by the petition method than it was technically possible for the state's voting machines to handle. Of Michigan's 6,972 precincts, 4,322 are serviced by voting machines.

The interest the legislature sought to protect falls squarely within Supreme Court pronouncements of legitimate and compelling state interests. In *Jenness,* the court said:

"There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot— the interest, if no other, in avoiding voter confusion, deception and even frustration of the democratic process at the general election." 403 U.S. at 442, 91 S.Ct. at 1976.

*Bullock, supra,* subsequently noted that:

"[The] State has a legitimate interest in regulating the number of candidates on the ballot. . . . In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections . . . we are bound to·respect the legitimate objective of the State in avoiding overcrowded ballots. Moreover, a State has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies." (Citations omitted.) 405 U.S. at 145, 92 S.Ct. at 857.

Both *Storer, supra,* and *American Party of Texas, supra,* more recently confirm the compelling nature of these interests. 415 U.S. at 732, 94 S.Ct. 1274; 415 U.S. at 782n,

94 S.Ct. 1296; *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1973), similarly recognizes that:

> "The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not. Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success." *Id.* at 715–716, 94 S.Ct. at 1319.

Michigan's legislature, under this duty to protect the political process from frivolous candidacies and faced with the prospect of the ballot and election machinery being overcrowded and overtaxed by parties qualifying under a petition requirement, has made a legislative determination that a new standard must be established which more accurately gauges "new" party support. Mr. Apol testified that he apprised the legislature by memorandum after the 1972 election, and advised an ad hoc committee in 1976 of the potential necessity of resort to the cumbersome and tedious manual method of paper ballots on a large scale should more than nine parties qualify with the attendant risk of confusing and discouraging voters and increasing voter "falloff."[2] In seeking to avoid these serious problems, the legislature sought to further the state's compelling interest in keeping the ballot within limits understandable to the voter and preventing the clogging of its election machinery.

 Plaintiffs contend that the legislature has selected nine parties as an arbitrary maximum ballot limitation, and adopted the .3% primary vote requirement as an arbitrary and unreasonable measure of a "modicum of support." It suffices in response to say that the number "nine" neither appears on the face of Act 94, nor is an implicit limitation. Although the legislature was properly concerned with the pos-

sibility of the ballot exceeding the capacity of available voting machines, it did *not* foreclose participation beyond that capacity. Thus, Act 94 provides real, not merely theoretical, access to the ballot, and if new parties demonstrate the requisite modicum of support, the state will accept the attendant burden, expense and disadvantages of paper ballots or the modification of its voting procedures to accommodate them. It is important to recognize that all state efforts in this regard are by definition designed to *restrict* candidate and party access. *Storer,* supra, notes:

> "As we indicated in Rosario, *the Constitution does not require the State to choose ineffectual means to achieve its aims.* To conclude otherwise might sacrifice the political stability of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot." 415 U.S. at 736, 94 S.Ct. at 1282. (Emphasis supplied.)

 It is clear, however, that a state may also run afoul of the Constitution by selecting too effective a means of limiting ballot access. This entails an inquiry into the burden imposed on new parties by the challenged legislation. In passing on the appropriate tests against which community support can be measured without unreasonably burdening the First or Fourteenth Amendments, the Supreme Court's general guideline has been that "admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support." *American Party of Texas, supra,* 415 U.S. at 782, 94 S.Ct. at 1307. The specific parameters established by recent decisions indicate that although 15% (and perhaps even 7%) is too burdensome on its face, petition requirements of between 1% and 5%, standing alone, comport with reasonableness as preconditions to ballot placement. *Storer, supra,* 415 U.S. at 739n, 94 S.Ct. 1274. See

---

**2.** "Falloff" is the term generally used to describe voting patterns which reflect a smaller

total vote being cast for offices or candidates listed further down on the ballot.

*Jenness v. Fortson, supra* (5% of those eligible to vote for office sought); *Auerbach v. Mandel*, 409 U.S. 808, 93 S.Ct. 55, 34 L.Ed.2d 69 (1972), (3%); *Wood v. Putterman*, 316 F.Supp. 646 (D.Md.1970), (three judge court), aff'd. mem., 400 U.S. 859, 91 S.Ct. 104, 27 L.Ed.2d 99 (1970), (3% of total number of registered voters entitled to vote for office sought); *Beller v. Kirk*, 328 F.Supp. 485 (S.D.Fla.1970), (three judge court), aff'd. mem. sub nom. *Beller v. Askew*, 403 U.S. 925, 91 S.Ct. 2248, 29 L.Ed.2d 705 (1971), (3% of the registered electors in the state); *Socialist Labor Party v. Rhodes*, 318 F.Supp. 1262 (S.D.Ohio 1970), (three judge court) moot on appeal sub nom., *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 585, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972), (7% of the total vote for governor struck down). *Storer, supra*, held that California's requirement of 5% of the entire vote cast in the preceding general election was not excessive in and of itself, but remanded for further proceedings to determine whether, in effect, a higher percentage was required by the disqualification of primary voters from the pool of those eligible to sign petitions. Although the above noted decisions deal only with percentage requirements for petitions, the underlying concept sanctions the determination of a prerequisite level of *support* not limited to any particular method of measurement.

*Storer, supra*, emphasizes that at the heart of the matter is the ultimate question whether a "reasonably diligent" party or candidate can be expected to satisfy the requirement. 415 U.S. at 724, 94 S.Ct. 1274. *American Party of Texas, supra*, citing *Jenness, supra*, observes that the burden:

> "may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot. The Constitution requires that access to the electorate be real, not 'merely theoretical.'" 415 U.S. at 783, 94 S.Ct. at 1307.

The validity of regulations which burden voter rights and ballot access is further governed by the principle that:

> "If there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" (Citations omitted) *Dunn v. Blumstein, supra*, 405 U.S. at 343, 92 S.Ct. at 1003.

Applied to Act 94, these standards require an analysis of the percentage of support demanded by the state's provisions, the practicability of compliance, and whether effective "less drastic" alternatives are available.

Although precise measurement is not possible at this time, the parties generally agree and the testimony supports that approximately 4,500 to 5,000 votes will be necessary to meet the .3% primary performance requirement. That figure constitutes only slightly more than one quarter of the number of petition signatures required, which requirement plaintiffs concede is reasonable. Indeed, plaintiff Ronald Glotta, State Chairman of the Communist Labor Party, testified that his party has support in excess of 4,500 votes in the 9th Congressional District alone. Plaintiffs object, however, that the pool of available primary votes is limited because voters go to primaries to cast major party candidacy votes. In the context of determining whether a certain percentage of support was unreasonable where the eligible pool was reduced by the actual *disqualification* of primary voters, *American Party of Texas, supra*, noted:

> "[I]t is not apparent to us why the new or smaller party seeking voter support should be entitled to get signatures of those . . . have already demonstrated their preference for other candidates for the same office the petitioning party seeks to fill." 415 U.S. at 785, 94 S.Ct. at 1308.

Michigan's statutory scheme limits voters to the same exclusive choice but, significantly, *before* they have cast a "disqualifying" ballot. Plaintiffs' contention that an impermissible barrier in effect arises from the nature of the primary itself (rather than

from any specific percentage level of required performance) is without merit for a second reason. In support, plaintiffs offered the testimony of Dr. Warren and Dr. Miller to the effect that the voters who traditionally attend primaries are the strongest major party adherents and highly unlikely to surrender their partisan candidate votes to merely support the addition of a new party to the ballot. Both plaintiffs' experts, however, admitted having no familiarity with a procedure such as required by Act 94 or with any studies dealing with a primary of this type. It is implicit that the requirements of Act 94 necessitate that "new" parties undertake the burden of marshalling their own support including, among others, those who would not otherwise attend the primary.

■ The mere fact that significant effort is called for in order to organize plaintiffs' supporters and get out the vote does not automatically dictate a decision that the statute imposes an insurmountable obstacle depriving them of all but theoretical access to the ballot. "Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization." *American Party of Texas, supra*, 415 U.S. at 787, 94 S.Ct. at 1309. The statutes at issue in *American Party of Texas* required new political parties to demonstrate support from that portion of the electorate *not* committed to the candidates of the established parties. The Court there upheld a statutory petition scheme which required, inter alia, in addition to a 1% signature requirement that such signatures be notarized, a 55-day limit on the circulation of petitions, and disqualification of those signers who voted in the primary, thus indicating support for other candidates or parties. The court, in upholding the statute, noted:

"The District Court recognized that any fixed percentage requirement is necessarily arbitrary, but we agree with it that the required measure of support— 1% of the vote for governor at the last general election and in this instance 22,-000 signatures—falls within the outer boundaries of support the State may require before according political parties

ballot position." (Citations omitted) 415 U.S. at 783, 94 S.Ct. at 1307.

Similarly, the Supreme Court reasoned in *Storer, supra*, that gathering 325,000 signatures (5%) in 24 days could be performed by 1,000 canvassers if each gathered fourteen signers a day. While standing alone this was a substantial requirement, the court found it to be a permissible burden to place upon an independent presidential candidate. 415 U.S. at 740, 94 S.Ct. at 1274.

Although the limited time between passage of this Act and the August primary presents additional problems to be discussed, *infra*, it is relevant that plaintiff Ronald Glotta's testimony indicated that the plaintiff Communist Labor Party, had it been aware a primary requirement would be imposed, would have conducted voter solicitation in conjunction with gathering petitions and incorporated notice of the primary into its literature. This compatability of efforts to organize voter support and the traditional canvassing for petition signatures further reduces the impact of the burden new parties must bear in complying with Act 94. If plaintiffs' petition signatures reflect more than merely nominal support, the initial contact that matures into a petition signature is an appropriate vehicle for attempting to channel that support toward the vote required at the primary election. The burden Act 94 imposes toward this end is simply one of publicizing a new primary obligation to the electorate in general and plaintiffs' constituencies in particular. Measured against the statutes upheld in *American Party of Texas, supra*, the activity necessary to thus mobilize the new parties' support would not require such an overwhelming additional expenditure of time and effort as to fall beyond the scope of *Storer's* "reasonably diligent efforts" standard.

The continuation of the petition requirement is an integral part of the new statutory framework Michigan has designed to govern new party access to the ballot. It is not duplicative of the measurement obtained by the primary requirement and consti-

tutes the initial phase of plaintiffs' demonstration that at least a modicum of community support exists. As in *American Party of Texas, supra,* Michigan has divided the means of demonstrating support into two procedures, a preliminary showing of petition support supplemented by a smaller, more precise measure of actual voter support. Furthermore, no excessive incidental regulations significantly increase the burden of the procedures in practice. Notably, no registered voters are excluded from signing a petition or voting for a new party in the primary on the basis of prior or present party affiliation; a two-year period preceding the primary is allowed to gather the signatures, the deadline for filing petitions is three months before the primary and the signatures submitted must have been obtained within six months of filing. M.C.L.A. § 168.685(1). The geographical diversity required is limited to securing a minimum of 100 signatures from any nine of the state's nineteen congressional districts, while up to 35% of the petition requirement and all of the primary vote may come from a single district. M.C.L.A. § 168.685. Compare *American Party of Texas, supra* (55 day limitation on circulating petitions permissible, period commencing after the primary, and primary voters disqualified from signing petitions).

This court cannot conclude as a matter of law that the current Michigan requirements are any more burdensome than those approved by the Supreme Court in other related cases. Having decided then that Act 94 imposes a reasonable burden dictated by a compelling state interest, the question still remains as to whether the state might have achieved its goals through "less drastic" means. As discussed earlier, Michigan's experience with the petition requirement has demonstrated that the petition method alone is an imprecise tool that does not satisfactorily forecast voter support of new parties. The "less drastic" alternatives which plaintiffs suggest possess the same deficiency in that they retain petition signatures as the basic index. (Plaintiff Hudler's Reply Brief, at page 5n) Neither increasing the number required, shortening the

circulation period, nor similar devices would necessarily cure the inherent defect of petitions. The legislature's use of the primary election machinery as an aid to ascertaining "new" party support reflects an attempt to design a procedure for measuring real community support that improves upon the shortcomings of the petition method without abandoning it altogether.

■ Although to the court's knowledge no other state currently uses this same means to gauge support, no constitutional mandate or decision limits state action to the use of the petition method alone. *Lubin v. Panish, supra,* notes that petitions "for example" may be used to measure voter support for new parties. 415 U.S. at 718, 94 S.Ct. 1315. Furthermore, the method chosen may not "always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required the States to do the impossible." *American Party of Texas, supra,* 415 U.S. at 786–787, 94 S.Ct. at 1309. Absent some showing that an equally effective, less drastic alternative exists, the legislature's decision to fundamentally change the nature of the laws regulating ballot qualifications is subject only to the guidelines of constitutional reasonableness considered, *supra.*

## II.

■ Plaintiffs' equal protection argument also stems from their having to give up their right to vote for a major party candidate at the primary election and, instead, indicate support for a party which might not otherwise be on the ballot at all. Plaintiffs argue that while major party voters may cast their primary ballots for any one party's candidates, plaintiffs' voters risk their party's failure to qualify for a ballot position. The absence of a similar risk for major party voters, however, is the result of the major parties having already qualified for the general ballot by polling in excess of 1% of the votes cast for the office of Secretary of State in the preceding election, not merely by virtue of their being

"major parties." Plaintiff Human Rights Party and the American Independent Party enjoy the same privileges, having also exceeded the 1% figure.

"So long as the larger parties must demonstrate major support among the electorate at the last election, whereas the small parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner." 415 U.S. at 783, 94 S.Ct. at 1307.

Lastly, Act 94 is also challenged here on the basis of a discriminatory effect on new parties with only a local base of support. Where, for example, a new party enjoys a strong local constituency and wishes only to run a candidate in one district, the primary performance requirement may potentially demand a showing of support equal to the amount of votes necessary to actually *elect* such candidate. Collaterally, plaintiffs assert that the voter who supports only a local candidate of a "new" party is foreclosed by the requirements of Act 94 from casting a ballot on state-wide offices for which the "new" party he supports fields no candidates. Plaintiffs' arguments are misdirected, however. Act 94 provides for the qualification of new political parties for the State of Michigan, not a particular county or district. Once a party satisfies those requirements, it may run a full slate of candidates eligible for every office in the state. The fact that a party wishes to call itself "local" or to run less than a full slate of candidates does not constitutionally obligate the state to provide a lower standard of ballot access for it. In *Storer, supra,* the court states:

"A new party organization contemplates a state-wide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office. From the standpoint of potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his independent status, even though his possible interest in the new party centers around a particular candi-

date for a particular office." 415 U.S. at 745, 94 S.Ct. at 1286.

Furthermore, plaintiffs' argument would apply with equal force to the petition requirement since it too requires signatures in excess of the vote necessary to elect to many individual offices in select districts. This alleged equal protection violation which plaintiffs see in Act 94 is but another aspect of the different route to the ballot which *Jenness, supra,* recognizes may be afforded new parties seeking ballot status without violating the Fourteenth Amendment.

We find that Act 94 serves compelling state interests in avoiding voter confusion and the overcrowding and clogging of its election machinery, as well as helping to insure that election winners are the choice of a majority of its voters. In addition, the provisions of Act 94 impose no undue burden on new parties seeking ballot status and can be satisfied by reasonably diligent efforts. The statutory scheme neither invidiously discriminates against new parties and their supporters nor impermissibly burdens the right of franchise and is reasonably enacted in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways.

### III.

One question remains. Plaintiffs urge that even if Act 94 is otherwise constitutional, its late April, 1976, effective date comes so close to the August 3, 1976, primary as to have deprived plaintiffs of due process by giving them so little time to marshal their supporters, publicize the necessity of primary voting and depriving them of the opportunity they would have had for proselytizing while they were getting their petitions filled earlier in the year.

It is beyond question that legislation may achieve constitutionally valid goals but infringe the Fourteenth Amendment by doing so in an unconstitutional manner. In the context of the statute challenged at bar, this principle calls for an inquiry into whether marshalling the re-

**1014**

quired support in the time allotted imposed a constitutionally unreasonable obstacle to compliance.

The passage of Act 94 late in April caught plaintiffs at a particularly prejudicial and inopportune time to begin attempting to comply with the new requirements. Their petition drives were either completed or nearly completed and the form of petition which had been used, pursuant to former M.C.L.A. § 168.685, indicated to signers that their signatures constituted the only action necessary to place the party on the ballot. Further, the opportunity for soliciting petition signatures and proselytizing for primary support at the same time was rendered impossible since petition gathering had all but drawn to a close when plaintiffs were first apprised of the primary performance requirement. In tandem then, these problems presented plaintiffs with an obligation substantially more difficult to satisfy than that which new parties will face in the future under Act 94 and deprived them of due process of law.

In a different vein, but contributing to the deprivation of due process, is the legislature's failure to take earlier action although fully apprised of the problem. Defendant director of elections Apol testified that he had advised the legislature after the 1972 election and again in the fall of 1975 that overcrowding problems were likely to arise in the next election. Apol testified before an ad hoc legislative committee involved with the proposed legislation in January or February of 1976, and the legislature was aware of the number of parties soliciting petition signatures and the potential consequences as to the 1976 election.

Depriving plaintiffs of adequate time and notice saddled them with an additional burden beyond that considered in the court's earlier assessment of the likelihood of compliance if reasonably diligent efforts are made. The short time limits, extra expense and duplicative effort required to regenerate the support of plaintiffs' constituencies falls outside *Storer's* "reasonably diligent efforts" standard and imposes an unneces-

sarily prejudicial burden on the plaintiff new parties seeking 1976 ballot status.

Accordingly, this court reaches the conclusion that Act 94 is a proper exercise of legislative discretion and does not offend the Constitution except as to its application to the general election for November, 1976. Insofar as the November, 1976 general election is concerned, the defendants are hereby directed to take such steps as are necessary to place on the November ballot all parties who would have been eligible based upon compliance with the pre-existing petition requirement.

A Judgment in conformity with this opinion shall be prepared by the plaintiffs forthwith and submitted to the defendants for their approval. Such judgment should be presented to the court for signature at the earliest possible date, since, in an election matter of this nature, time is of the essence to all parties.

ADDENDUM

Subsequent to circulation for approval of what has now become the majority opinion, Judge Feikens filed his dissent. It is felt that the following is relevant to a clearer understanding of the majority opinion in light of the rationale of the dissent.

To begin with, the dissent places considerable emphasis on what is termed the "motives of the legislature." There are two problems with this. First, there is no legislative history as such in connection with Michigan legislation, and the only testimony in the record as to so-called motives is that supplied by the State Elections Director who is neither a member of the legislature nor employed by the legislative branch of government.

Second, and more importantly, there is no need to ascertain legislative intent in this case. This is not a matter of statutory construction. The intent and meaning of Act 94 is clear to everyone. It is only its effect that is at issue.

"It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative

motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1967)

*O'Brien* also quotes from *McCray v. United States*, 195 U.S. 27, 56, 24 S.Ct. 769, 49 L.Ed. 78 (1904):

"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."

The *O'Brien* court then goes on to state:

"Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply interpretation of legislation, the Court will look to statements as to the purpose of the legislation . . . . It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face . . . ." *Id.*, 391 U.S. at 383, 384, 88 S.Ct. at 1682.

*O'Brien* is also relevant with regard to what it has to say about *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), cited in the dissenting opinion in this case.

"O'Brien's position, and to some extent that of the court below, rest upon a misunderstanding of *Grosjean v. American Press Co.*, 297 U.S. 233 [56 S.Ct. 444, 80 L.Ed. 660] (1936) and *Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). These cases stand, not for the proposition that legislative motive is a proper basis for declaring a statute unconstitutional, but that the inevitable effect of a statute on its face may render it unconstitutional." *Id.*, 391 U.S. at 384, 88 S.Ct. at 1683.

This discussion of legislative intent is not intended to imply that taking the State Elections Director's testimony in its entirety indicates any improper legislative motive. The legislative consideration was generated by a concern that more than nine parties on the ballot would cause voter confusion and election chaos. Notwithstanding that fact, the legislature did not pass legislation which absolutely limited the ballot to any arbitrary number. Legislators deal with problems in practical terms, and even if a consideration of the legislative history were proper in this case, one could not expect to find the legislature discussing this matter in terms of "compelling state interests" or other judicially coined phrases.

It is also suggested in the dissent that Act 94 must fail because it is not the least "drastic means" available to meet the "vital governmental interest" which is viewed in the dissent as finding a "process [which] more accurately measures the prospects of minority parties for success in the general election."

 It would thus appear that the majority and the dissent do not see the "vital governmental interest" or the "compelling state interest" in the same terms. In the view of the majority, the compelling state interest is the protection of the election process, i. e., avoiding voter confusion, preventing the clogging of the election machinery, and assuring that the winner is the choice of the majority or at least a strong plurality. *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1971). In order to protect the election process, the state may, if it deems necessary, look to means which limit access to the ballot by new parties. One legitimate way of limiting such access would be to find out which parties had the least support, and these would be the ones whose ballot access would be limited. There is no doubt that if Act 94 serves its intended legislative purpose some parties will at some time be kept off the ballot. As pointed out earlier, the state is not required to choose ineffectual means to accomplish its legitimate purposes. If, in fact and law, Act 94 has a defect, it would not be that it is a hurdle, but that it is a barrier.

It is impossible for this court or even the legislature to say in advance what the least drastic *effective* means of dealing with this problem would be. There is no one solution, and what works or doesn't work will always be a hindsight conclusion. The role

of the court is not to tell the legislature how to do it, but only in a proper case to indicate whether the method actually chosen offends the Constitution.

FEIKENS, District Judge (dissenting).

I respectfully dissent from the majority decision holding that Act 94 is not constitutionally infirm. I concur with the majority decision that Act 94 as applied to the 1976 general election is violative of plaintiffs' due process rights. I would hold that Act 94 is constitutionally invalid for these reasons:

According to the testimony of Bernard Apol, Michigan's Director of Elections and a participant in the drafting of Public Act 94, the new law was adopted because it became evident that more than nine political parties would qualify for ballot positions in the November 1976 general election under existing election laws. Michigan makes extensive use of voting machines of a type that cannot accommodate more than nine parties so long as the option of straight party ticket voting is provided. Since the straight party ticket option is statutorily mandated, the state would have to employ punch cards or paper ballots in the event that more than nine parties qualified for ballot positions. According to Apol, many legislators believed that Act 94 would restrict the number of qualifying parties to less than nine; Apol stated that the Act was adopted for the obvious purpose of keeping minor parties off the ballot.

In addition to the pre-existing petition requirement, Act 94 requires that:

> To qualify to have its name, party vignette, and candidates appear on the general election ballot a party whose party name only appears on the primary ballot shall receive a vote total of more than ³⁄₁₀ of 1% of the total number of voters appearing at that primary election as shown by the poll books.

M.C.L.A. § 168.560b(4) (Supp.1976).

Few of the voters appearing at the primary election are likely to vote to place a new party on the general election ballot, however, for the Act also provides:

> A voter shall be entitled to vote for candidates of 1 political party only, *or* to indicate a desire that 1 party and its candidates appear on the general election ballot.

M.C.L.A. § 168.560b(3) (emphasis added). According to the testimony of Dr. Donald Warren, an expert in political sociology, the mutually exclusive choice presented to primary voters will have the effect—given the traditional role of a primary—of making the voters more likely to choose a candidate of a major party than to vote to place a new party on the ballot. The pool of potential new party supporters is thus likely to be a relatively small portion of the primary turnout. For this and other reasons plaintiffs challenge Act 94 as an unduly burdensome restriction on their access to the ballot.

While research does not disclose that an electoral restriction of the kind imposed by Public Act 94 has ever before been judicially tested, the general principles of law that should govern the court's decision are clear. As the Supreme Court recently stated:

> In several situations concerning the electoral process, the principle has been developed that restrictions on access to the electoral process must survive exacting scrutiny. The restriction can be sustained only if it furthers a "vital" governmental interest, *American Party of Texas v. White,* 415 U.S. 767, 780–781 [94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744] (1974), that is "achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." *Lubin v. Panish,* 415 U.S. 709, 716 [94 S.Ct. 1315, 1320, 39 L.Ed. 702] (1974). See *American Party of Texas v. White, supra* [415 U.S.] at 780 [94 S.Ct. 1296 at 1305] (1974); *Storer v. Brown,* 415 U.S. 724, 729–730 [94 S.Ct. 1274, 1278–1279, 39 L.Ed.2d 714] (1974).

*Buckley v. Valeo* (1976), 424 U.S. 1, at 92–94, 96 S.Ct. 612, at 670, 46 L.Ed.2d 659.

Under the strict scrutiny standard of review that must be applied to statutes restricting access to the ballot, the state has the burden of establishing the necessity of the restriction. *Bullock v. Carter*, 405 U.S. 134, 147, 92 S.Ct. 849, 858, 31 L.Ed.2d 92 (1972) ("*there must be a showing of necessity*"). (emphasis supplied). As stated in *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972):

> [T]he State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," *NACCP v. Button*, 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405] (1963); *United States v. Robel*, 389 U.S. 258, 265 [88 S.Ct. 419, 424, 19 L.Ed.2d 508] (1967), and must be "tailored" to serve their legitimate objectives. *Shapiro v. Thompson, supra* [394 U.S. 618], at 631 [89 S.Ct. 1332, at 1329, 22 L.Ed.2d 600]. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." *Shelton v. Tucker*, 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231] (1960).

The issues for decision are, first, whether the state has shown a vital governmental interest that is served by Act 94, and second, whether the state has shown that Act 94 is necessary to serve that interest in the sense that no less drastic means are available. As to the vital governmental interest, the state asserts that its purpose was to require new and minority political parties seeking ballot status to demonstrate a modicum of community support. While this is, of course, a well-established and legitimate function of state election laws, it smacks somewhat of *post hoc* rationalization in view of Apol's explicit testimony as to the immediate evil that Act 94 was designed to remedy, namely, the prospect that more parties would qualify than would fit on the voting machines. The state recognizes that the petition method is used in over 30 states to measure community support, that Michigan employed the petition method prior to Act 94, and, indeed, that Michigan has retained the petition requirement even after Act 94. Yet the assertion is made that "experience over time has revealed that at least in Michigan the petition method is an extremely imprecise method for measuring community support." Post-Trial Brief of Defendants, dated July 8, 1976, at 7. Assuming that "community support" means potential votes in the general election rather than support for giving the party a place on the ballot, there is indeed evidence in this record for the state's assertion. However, there is no evidence that this was a concern of the legislature in adopting Act 94, or even that the inefficacy of the petition method as a measure of community support was brought to their attention. If this had been one of their concerns, it is difficult to imagine a reason for retaining the petition method in addition to the primary method. If, as the state asserts, the petition method is "extremely imprecise," its continued use would seem to lack even a rational basis.

The state contends, nonetheless, that the legislature's actual purpose is irrelevant, stating:

> Although the Michigan legislature may have enacted Act 94 in response to the very real possibility that more than nine political parties would appear on the November 1976 general election ballot thereby preventing the use of voting machines, *the motivation of the legislature cannot be utilized in determining the constitutionality of Act 94.*

Post-Trial Brief of Defendants at 9. (emphasis added). I have difficulty with the proposition that the avowed purpose of the legislature may be ignored in the judicial review of its enactments. Where important constitutional rights are at stake, especially the rights of political parties whose interest in obtaining access to the ballot is in direct conflict with the interests of the major party legislators in remaining in office, it seems appropriate that the motives of the

legislature as well as the effects of the legislation should be strictly scrutinized.*

Even assuming, however, that the "vital governmental interest" behind Act 94 is the need to supplement the inadequate petition method with a process that more accurately measures the prospects of minority parties for success in the general election, the state has failed to carry its burden of showing that the primary method is necessary. Indeed, on this record it is not even established that the primary method, either alone or in conjunction with the petition method, will be any more effective than the petition method in measuring "community support." When asked whether Act 94 is a fair test of new party support, Dr. Warren answered in the negative, stating that primaries do not indicate party strength. Dr. Warren Miller, a Professor of Political Science at the University of Michigan with particular expertise in voting behavior, stated that the primary would have no predictive value as to the party's showing in the general election. In fact, Dr. Miller went so far as to state that there is no valid way of using a primary to demonstrate a modicum of community support. It is true, as the majority points out, that no procedure similar to that of Act 94 has been subjected to scholarly analysis. This fact certainly reflects upon the weight to which the experts' opinions are entitled. However, persons who have devoted their professional careers to the study of elections and voting behavior have valuable expertise that may shed light on the effect that a new procedure will have in practice, even if it has never before been tried. More important, the state has produced no evidence that the primary *will* achieve its purported ends. Even if we were to discount the expert testimony in its entirety, the state has failed to discharge its burden of showing that the primary requirement imposed by Act 94 is even effective, not to mention necessary.

Looking, on the other hand, to the true purpose of Act 94—namely, to preserve the use of the state's voting machines—it is clear that less drastic means are available. It is the testimony of Mr. Apol that the voting machines' capacity is limited to nine parties only if the straight party ticket option is provided. The legislature might, therefore, have achieved its purpose simply by deleting the statutory requirement for the straight party ticket option. While the voters of the state may have some slight interest in the convenience of voting for all the candidates of one party by pulling a single lever, this interest is *de minimus* as weighed against the rights of plaintiffs in access to the ballot. Moreover, the testimony of Dr. Miller suggests that more than half of the present Michigan electorate is independent, *i. e.*, does not identify with either major party. This fact tends to minimize even further the interest of the state in the straight party ticket option—it may be assumed that the trend toward independent voting means an increase in ticket splitting. Finally, the elimination of the straight party ticket option would further the purpose of encouraging the electorate to exercise more discrimination in their use of the franchise.

History reveals numerous instances in which legislative restrictions have been enacted to curtail the right to vote for candidates or parties. Often these restrictions have been directed at political parties or candidates who advocate unpopular posi-

---

* The Supreme Court has frequently considered the motives of the legislature in reviewing legislation for constitutionality. In *Gomillion v. Lightfoot*, 364 U.S. 339, 347–48, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960), the Court stated:

. . . "Acts generally lawful may become unlawful when done to accomplish an unlawful end, *United States v. Reading Co.*, 226 U.S. 324, 357 [33 S.Ct. 90, 57 L.Ed. 243], and a constitutional power cannot be used by way of condition to attain an unconstitutional result." *Western Union Telegraph Co. v.*

*Foster*, 247 U.S. 105, 114 [38 S.Ct. 438, 439, 62 L.Ed. 1006].

Similarly, in *Griffin v. County School Board*, 377 U.S. 218, 231, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1964), the Court stated:

Whatever nonracial grounds might support a State's allowing a county to abandon public schools, *the object must be a constitutional one, and grounds of* race and opposition to desegregation do not qualify as constitutional. (emphasis added).

tions or indeed simply exercise the right to dissent. Frequently, reasons for such actions are given which seem superficially sound.

It is because of this that our rules of law place a heavy burden on the state to justify its actions when it legislates restrictions on voting rights. This burden should never be shifted by the judiciary.

For these reasons, I find that the state has failed to carry its burden of justifying Act 94.