FLOYD EDWARD NACHTWEY, Plaintiff, *v.* THE HONORABLE NELSON K. DOI, as Lieutenant Governor of the State of Hawaii, and THE HONORABLE MORRIS TAKUSHI, as State of Hawaii Elections Administrator, Defendants

NO. 6329

August 16, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

On August 18, 1976, plaintiff Floyd Edward Nachtwey, an indigent, sought to file as a candidate for the United States House of Representatives from the First Congressional District of Hawaii. He was denied a place on the election ballot for his failure to comply with HRS § 12-6(4).[1] This law allowed an indigent to file as a candidate for the House of Representatives by submitting a petition signed by at least one-half of one percent (.5%) of the total registered voters in the congressional district at the time of filing. In plaintiff's case, 759 signatures were needed. A non-indigent candidate would have been required, instead, to pay a filing fee of $75.00 and to present nominating papers signed by twenty-five registered voters in the congressional district.[2]

Plaintiff and defendants, elections officials of the State of Hawaii, submitted this case on stipulated facts to this court.[3] After full argument on the merits, we issued an order on October 15, 1976, denying plaintiff's request to be placed on the ballot for the 1976 General Election. This opinion now discusses the basis for our order.

---

[1] The chief election officer or clerk shall waive the filing fee in the case of a person who declares himself, by affidavit, to be indigent and who has filed a petition signed by at least one-half of one percent of the total voters registered at the time of filing in the respective district or districts which correspond to the specific office for which the indigent person is a candidate. This petition shall be submitted in lieu of nomination papers required by this chapter . . . .
HRS § 12-6(4)(1976)(amended 1977) [hereinafter cited as HRS § 12-6(4)]. Throughout this opinion we will refer to HRS § 12-6(4) as it was in effect at the time of plaintiff's attempted candidacy.

[2] *Compare* HRS § 12-6(2)(1976)(amended 1977) [hereinafter cited as HRS § 12-6(2)] *with* HRS § 12-5 (1976).

[3] Pursuant to HRS § 602-5(3)(1976) and Haw. Sup. Ct. R. 21.

432

Plaintiff and defendants agreed, *inter alia,* to the following facts:

1. That HRS § 12-6(4) which provides that indigent candidates must submit a petition in lieu of a filing fee was signed into law by the Governor on May 14, 1976. This law was published on July 21, 1976, and was available to the public at the office of the elections officials on July 30, 1976.

2. That for candidates seeking election to Congress in 1976, nomination papers were required to be filed no later than August 18, 1976.

3. That prior to August 16, 1976, plaintiff anticipated running in the 1976 election for the U. S. House of Representatives; that plaintiff knew there was a $75.00 filing fee for congressional candidates; that plaintiff knew the state had procedures to follow in order to waive the filing fee for indigent candidates; that prior to August 16, 1976, plaintiff knew he would file as an indigent candidate; and that plaintiff made no effort to consult with the elections officials, prior to August 16, 1976, about filing procedures for indigent candidates.

4. That on August 16, 1976, plaintiff went to the state elections officials to obtain nomination papers for the Office of United States Representative, First Congressional District. On that date, plaintiff became aware of the requirements of HRS § 12-6(4).

5. That on August 18, 1976, plaintiff returned to the state elections officials with his nomination papers and attempted to file them.

6. That because plaintiff failed either to submit the petition required by HRS § 12-6(4) or to pay the filing fee required by HRS § 12-6(2), his nomination papers were rejected.

7. That the state has a legitimate interest in keeping its ballots within manageable limits and in limiting ballot access to serious candidates.

8. That one purpose of the state's requirement that

candidates pay a filing fee or submit a petition is to limit ballot access to serious candidates.

*ISSUES PRESENTED*

Plaintiff raised the following issues:

1. Whether HRS § 12-6(4) violates the Equal Protection Clause of the Fourteenth Amendment by creating a distinction among political candidates based upon wealth.

2. Whether HRS § 12-6(4) is an unreasonable means of ballot access for indigent candidates.

3. Whether immediately upon the effective date of HRS § 12-6(4) the state had a duty to personally notify all persons within the state who might possibly have been affected by that law so that the failure to so notify a person who was in fact affected by HRS § 12-6(4) deprived that person of procedural due process.

4. Whether the requirements of HRS § 12-6(4) create a *de facto* prohibition against indigent candidates from seeking elective office so as to deprive such persons of substantive due process.

*DISCUSSION*

We answer all issues in the negative. Of the four, the first two focus on equal protection while the last two deal with due process.

*Equal Protection Analysis*

The United States Constitution declares that no state shall "deny to any person within its jurisdiction the equal protection of laws." U.S. Const. Amend. XIV, § 1. A claim that a state law denies "the equal protection of the laws" is one which alleges that the state law imposes an "invidious

discrimination" upon a certain class.[4] *Williams v. Rhodes*, 393 U.S. 23, 30, 34 (1968); *Ferguson v. Skrupa*, 372 U.S. 726, 732 (1963). There are two ways in which an invidious discrimination may take place.

First, a state law invidiously discriminates when it creates a suspect classification[5] or infringes[6] upon a fundamental constitutional right[7] and the state fails to show that the law is necessary to promote a compelling state interest. *Compare Williams v. Rhodes, supra* at 30-31, 34 *with San Antonio School District v. Rodriguez*, 411 U.S. 1, 16-17 (1973).

Suppose a law applies to a class of individuals and that class either forms a suspect classification or, if no suspect classification is formed, has a fundamental right infringed

---

[4] "[T]he equal protection of the laws is a pledge of the protection of equal laws." Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886). "But laws may classify." Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 344 (1949). Since "the very idea of classification is that of inequality, . . . the fact of inequality [by itself] in no manner determines the matter of constitutionality." Atchison, Topeka & Santa Fe R.R. v. Matthews, 174 U.S. 96, 106 (1899); *see* Carrington v. Rash, 380 U.S. 89, 92 (1965). In requiring that invidious discrimination be present before a law is struck down for violating "the equal protection of the laws," the United States Supreme Court takes a middle ground between the demand for equality and the legislative right to classify. Tussman & tenBroek, *supra* at 344.

[5] *E.g.*, Korematsu v. United States, 323 U.S. 214 (1944)(race). A suspect classification exists where the class of individuals formed has been

saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

San Antonio School District v. Rodriguez, 411 U.S. 1, 28 (1973).

[6] Other verbal formulations for "infringes" are, *e.g.*, "impinges," "penalizes," "deprives," "interferes," and "denies." *See* San Antonio School District v. Rodriguez, 411 U.S. 1, 17, 31, 38 (1973). These different verbal formulations apparently all mean the same thing, reflecting perhaps the ductility of words in the English language. Sometimes formulations such as "involves" or "might invade or restrain" are used. *See* Carey v. Population Services International, 431 U.S. 678, 686 (1977); Harper v. Virginia Bd. of Elections, 383 U.S. 663, 670 (1966). These formulations, however, are used in the same sense as "impinges," "penalizes," etc.

[7] *E.g.*, Shapiro v. Thompson, 394 U.S. 618 (1969)(right of interstate travel). A fundamental constitutional right is that "explicitly or implicitly guaranteed by the Constitution." San Antonio School District v. Rodriguez, 411 U.S. 1, 33-34 (1973).

upon. To uphold that law a court must find, in balancing the state interest furthered by the law with the harm to be suffered by the affected class,[8] that the state interest is a compelling one, *i.e.*, the state interest outweighs the harm. *See American Party of Texas v. White*, 415 U.S. 767, 780, 782 n. 14, 787-88 (1974) (the state interest outweighs the fundamental right to associate); *Korematsu v. United States*, 323 U.S. 214 (1944) (although race is a suspect classification, the national interest outweighs the injustice to one racial group).

In determining whether the state interest behind a law is a compelling one, a court will review that law with strict scrutiny. *Compare Dunn v. Blumstein*, 405 U.S. 330, 335-43 (1972) *with San Antonio School District v. Rodriguez, supra* at 16-17. The strict scrutiny standard of review

> means that the State [law] is not entitled to the usual presumption of validity, that the State rather than the [class of individuals] must carry a "heavy burden of justification," that the State must demonstrate that its [law] has been structured with "precision," and is "tailored" narrowly to serve legitimate objectives and that it has selected the "less drastic means" for effectuating its objectives . . . .

*Id.* at 16-17.

Second, even where a state law does not create a suspect classification or does not infringe upon a fundamental constitutional right, that law may invidiously discriminate against the class of individuals it affects if the law fails to

---

[8] *See Developments in the Law – Equal Protection*, 82 Harv. L. Rev. 1065, 1103-04, 1122-23 (1969) (hereinafter *Developments – Equal Protection*). When a suspect classification is involved, a court will focus on the state's objective to see whether it outweighs the injustice of disadvantaging one group in comparison to another. *See id.* at 1132. Similarly, when a fundamental right is involved, a court will weigh the benefits flowing from pursuit of the state's objective against the detriments resulting from the impairment of a basic personal interest. If the state's objective is not important enough to justify impairment of the individual's interest, the classification will fall.

*Ibid.*

"rationally furthe[r] a legitimate state purpose or interest."[9] *Id.* at 55. In this case, the correct standard of review is not strict scrutiny but whether the law has a rational basis. *E.g.*, *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 489 (1977). The rational basis standard of review is

> a relatively *relaxed* standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. . . . *Such [law] by a legislature is presumed to be valid.*

*Ibid.* (citation omitted)(emphasis added). The use of this standard or test in a particular case is no guaranty that the challenged law is constitutional.[10]

Thus the threshold question is whether HRS § 12-6(4) should be reviewed under the rigid "strict scrutiny" or under the lenient "rational basis" standard of review. *Bullock v. Carter*, 405 U.S. 134, 142 (1972). If the rational basis standard should apply, we must then ask whether HRS § 12-6(4) rationally furthers a legitimate state interest. To answer these

---

[9] Other formulations are whether the law lacks "a rational relation to a legitimate state interest" and whether the "classification [created by the law] rests on grounds wholly irrelevant to the achievement of the State's objective." *See* Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 489 (1977); Turner v. Fouche, 396 U.S. 346, 362 (1970).

[10] *See, e.g.*, Reed v. Reed, 404 U.S. 71 (1971)(state law invalid); McDonald v. Board of Election, 394 U.S. 802 (1969)(state law valid). When the Supreme Court used the rational basis test in the past, it was almost a foregone conclusion that the challenged law was constitutional. Today, however, the era of extreme judicial deference begun under the Warren Court appears to have ended. *Compare Developments – Equal Protection, supra* note 8, at 1076-87 (in past years, the Supreme Court "almost abandoned the task of reviewing questions of equal protection," *id.* at 1087) *Gunther, The Supreme Court 1971 Term — Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 17-20 (1972) ("the Court . . . has suddenly found repeated occasions to intervene on the basis of the deferential standard [rational basis]," *id.* at 19) *and Forum: Equal Protection and the Burger Court*, 2 Hastings Const. L.Q. 645, 649-50, 657 (1975). This means that a challenged law, if examined under the rational basis test, has no predetermined guaranty of constitutionality. *See also* Tussman & tenBroek, *supra* note 4, at 365-68.

questions, we must examine three features of HRS § 12-6(4) and the classification (indigents) it covers:

> [T]he character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification.

*Dunn v. Blumstein, supra* at 335; *accord, Williams v. Rhodes,* 393 U.S. at 30.

### 1. *The character of the classification.*

Under issue one, plaintiff argues that strict scrutiny of HRS § 12-6(4) is required because that law creates "a distinction among political candidates based upon wealth." By this, plaintiff implies that a classification based on wealth is suspect, therefore requiring strict scrutiny.

When the phrases "wealth classification" and "wealth discrimination" are used, a court actually focuses upon a "poverty classification" to see whether *de jure* or *de facto* discrimination exists against a definable class of poor people. *See San Antonio School District v. Rodriguez,* 411 U.S. at 18-20.

Because HRS § 12-6(4) applies solely to indigent candidates, it classifies on the basis of indigency and stands as an example of a *de jure* poverty classification. But even if a law creates a *de jure* or results in a *de facto* classification of the poor, that alone does not invalidate the law,[11] for "where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Id.* at 24.

Where invidious discrimination against indigents has been found in prior Supreme Court cases, those prior cases reflected the understanding that the exercise of fundamental

---

[11] *Compare* James v. Valtierra, 402 U.S. 137 (1971)(*de jure* poverty classification upheld) *with* United States v. Kras, 409 U.S. 434 (1973)(*de facto* poverty classification upheld).

rights cannot depend upon one's ability to pay. *See, e.g., Douglas v. California,* 372 U.S. 353, 355 (1963). There is, however, no such understanding with respect to the enjoyment of important but nonfundamental rights, *e.g.,* education,[12] nor is there a requirement that laws must affect all economic classes equally.[13]

> Thus, the United States Supreme Court has never heretofore held that wealth discrimination *alone* provides an adequate basis for invoking strict scrutiny.[14]

*San Antonio School District v. Rodriguez, supra* at 29 (emphasis added); *accord, Maher v. Roe,* 432 U.S. 464, 471 (1977); *San Antonio School District v. Rodriguez, supra* at 102 n. 61, 121 (Marshall, J., dissenting); J. Nowak, R. Rotunda & J. Young, Constitutional Law at 619-623 (1978). *See generally* L. Tribe, American Constitutional Law at 1099-1136 (1978). By implication, since a suspect classification always invokes strict scrutiny, the class of indigents alone cannot be a suspect classification.[15] *See San Antonio School District v. Rodriguez, supra* at 40. We therefore cannot apply the strict

---

[12] San Antonio School District v. Rodriguez, 411 U.S. 1, 36-37, 40 (1973). *See generally* Douglas v. California, 372 U.S. 353, 361-62 (1963)(Harlan, J., dissenting). "The State may have a moral obligation to eliminate the evils of poverty, but it is not required by the Equal Protection Clause to give to some whatever others can afford." *Id.* at 362 (Harlan, J., dissenting).

[13] While we are mindful of the disproportionate burdens that laws of general applicability may place on the rich and the poor, that

> [t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread[,]

Anatole France, *quoted in* Griffin v. Illinois, 351 U.S. 12, 23 (1956)(Frankfurter, J., concurring), we as a court must judge a law in terms not of its charity but of its constitutionality.

[14] *Dicta* in certain cases have implied otherwise. *See* McDonald v. Board of Election, 394 U.S. 802, 807 (1969); Harper v. Virginia Board of Elections, 383 U.S. 663, 668 (1966).

[15] For a valuable discussion on the inappropriateness of labeling a poverty classification as suspect, *see* Mr. Justice Marshall's dissenting opinion in San Antonio School District v. Rodriguez, 411 U.S. 1, 121-22 (1973) ("That wealth classifications alone have not necessarily been considered to bear the same high degree of suspectness as have classifications based on, for instance, race or alienage may be explainable on a number of grounds," *id.* at 121).

scrutiny standard of review on the basis that a suspect classification exists.

### 2. *The individual interest affected.*

Issue two asks whether HRS § 12-6(4) violates the Equal Protection Clause by failing to provide a reasonable means of ballot access for indigent candidates. Plaintiff claims that this failure infringes upon a fundamental right, thus requiring strict scrutiny as the appropriate standard of review.

Candidacy *per se* lacks status as a fundamental constitutional right. *Bullock,* 405 U.S. at 142-43. Consequently, a burden placed upon avenues to candidacy *alone* (*e.g.,* without a concomitant infringement upon a fundamental right) will fail to invoke strict scrutiny. *See ibid.* Yet, as the Supreme Court has recognized:

> [T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.

*Id.* at 143. The same can be said about the rights of individuals to associate and the rights of candidates. *Compare ibid.* (the rights of voters and of candidates are intertwined) *with Williams v. Rhodes,* 393 U.S. at 30 (the rights of voters and of individuals to associate overlap). Both types of rights are fundamental:

> [These] two different, although overlapping, kinds of rights [are] the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

*Ibid; accord, Storer v. Brown,* 415 U.S. 724, 729 (1974). Thus, under some circumstances the right to candidacy must be treated as though it were a fundamental right. *See generally* L. Tribe, *supra* at 775, 777-84.

Our task, then, is to determine whether HRS § 12-6(4)

places a substantial burden on either the right to associate for political purposes or the right to vote effectively when that law requires indigents to obtain signatures of .5% of the registered voters in order to be placed on the ballot. Whenever a law infringes upon or "substantial[ly] burdens"[16] the exercise of the right to associate or the right to vote effectively, it must promote a compelling state interest. *Williams v. Rhodes, supra* at 30-31. Here, the two rights overlap considerably.

The right of individuals to associate for political purposes is substantially burdened if people of a particular political viewpoint of some significant number cannot place a single candidate of similar belief on the election ballot, for they are then deprived of a forum in which to pursue political goals. *See Developments in the Law – Elections,* 88 Harv. L. Rev. 1111, 1135-36 & n. 86, 1176-77, 1218 (1975).

Similarly, the right of the electorate to vote effectively is substantially burdened if votes may be cast only for a limited selection of candidates when other candidates are clamoring for a place on the ballot, for "a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish,* 415 U.S. 709, 716 (1974); *cf. Williams v. Rhodes, supra* at 31.

Therefore, under the circumstances of this case, the crucial inquiry as far as these two rights are concerned is whether HRS § 12-6(4) provides a reasonable means of ballot access for indigent candidates. *See Lubin, supra* at 718. We must "assess realistically whether the law imposes excessively burdensome requirements," *i.e.,* whether a reasonably diligent indigent candidate can "be expected to satisfy the signature requirements, or will it be only rarely that [he] will succeed in getting on the ballot?" *Storer v. Brown, supra* at 738, 742. "The Constitution requires that access to the

---

[16] Storer v. Brown, 415 U.S. 724, 729 (1974); *accord,* Bullock v. Carter, 405 U.S. 134, 144 (1972)("has a real and appreciable [deterrent] impact"). In this opinion, "infringes upon" is used as having the same meaning as "substantially burdens."

electorate be real, not 'merely theoretical.' " *American Party of Texas v. White,* 415 U.S. at 783.

If a reasonably diligent indigent candidate can satisfy the signature requirement, then the right to candidacy is not infringed.

We note first that under HRS § 12-6(4) a petition must be signed by .5% of the registered voters in plaintiff's congressional district. Since a signature requirement of five percent (5%) is valid on its face, a fortiori, a .5% signature requirement is also presumptively valid. *See id.* at 789; *Storer v. Brown, supra* at 738; *Jenness v. Fortson,* 403 U.S. 431 (1971). An aspiring candidate, even if indigent, may be required to demonstrate more than a mere wish to be elected to Congress. A requirement that a candidate show a significant modicum of support is hardly unconstitutional. *American Party of Texas v. White, supra* at 789. Furthermore, the number of signatures actually required in this case (759) is not "an impractical undertaking for one who desires to be a candidate for [United States Representative]." *Storer v. Brown, supra* at 740.

Second, there are "no suffocating restrictions whatever upon the free circulation of . . . petitions." *Jenness v. Fortson, supra* at 438. Had such restrictions been present, they might have rendered the .5% figure unconstitutional. *See id.* at 438-40. But here as in *Jenness,*

> [a] voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand, is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized.

*Id.* at 438-39 (footnotes omitted).

Third, an indigent candidate could have solicited signatures for his petition as early as May 14, 1976, giving him over

two months in which to obtain the necessary signatures by the filing deadline of August 18, 1976.[17]

Finally, plaintiff has presented "absolutely no factual basis in support of [his] claim" that HRS 12-6(4) imposed impracticable or unduly burdensome requirements upon the class of indigent candidates. *American Party of Texas v. White, supra* at 790. "If claiming an equal protection violation, [plaintiff's] burden was to demonstrate in the first instance a discrimination against [him] of some [constitutional] substance."[18] *Id.* at 781. Rather, plaintiff showed little diligent or reasonable conduct. Although he anticipated running as an indigent candidate for Congress prior to August 16, 1976, and knew that there were procedures to follow in order to waive the filing fee for indigents, he made no effort to find out what those procedures were. He became aware of the specific requirements of HRS § 12-6(4) and obtained nomination papers on August 16, only two days before the candidacy filing deadline of August 18, 1976. Lastly, the record is barren of any attempt by plaintiff to solicit the required signatures for an indigent's petition between August 16 and August 18, 1976.

A reasonably diligent indigent candidate could have gathered signatures totalling .5% of the registered voters. Hence, even assuming that under these circumstances the right to candidacy is fundamental, because that right was not infringed the strict scrutiny standard of review cannot be invoked. Furthermore, since neither a fundamental right has been infringed upon nor a suspect classification has been

---

[17] Although we hold, under the *Due Process Analysis, infra,* that HRS § 12-6(4) applied to indigent candidates from May 14, 1976, even if it applied only from July 30, 1976 (when the law was available to the public at defendants' office, Stipulated Fact 1, *supra*), the period from July 30 through August 18, 1976, was sufficient time in which to obtain 759 signatures. From May 14, 1976, plaintiff needed to collect signatures at the rate of only eight per day; from July 30, 1976, only thirty-eight per day.

[18] *I.e.,* that a fundamental right was infringed. A *de minimis* effect on a fundamental right will not evoke strict scrutiny. *See* American Party of Texas v. White, 415 U.S. 767, 789 (1974); *cf.* Fuentes v. Shevin, 407 U.S. 67, 90 n. 21 (1972).

created (Part 1., *supra*) we must apply the rational basis standard of review to the classification of indigents created by HRS § 12-6(4) and inquire whether HRS § 12-6(4) rationally furthers a legitimate state interest.

### 3. *The governmental interests involved.*

Plaintiff asserts that it is unreasonable to have indigent candidates solicit petition signatures while non-indigent candidates only pay filing fees. If this state were pursuing identical interests in having petitions, HRS § 12-6(4), and in having filing fees, HRS § 12-6(2), plaintiff's assertion would, perhaps, be true. But because different interests are promoted by petitions and filing fees, there is a rational basis for the different treatment of indigents and non-indigents.

The Supreme Court has recognized that a state's interest in limiting its ballot to serious candidates[19] is of the highest order. *See Lubin*, 415 U.S. at 715. Unless the ballot is free from the presence of numerous frivolous candidates, rational voter choices not only become more difficult and confusing but voters are discouraged from participating in the electoral process. *See ibid.* As the Supreme Court has remarked:

> The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not.

*Ibid.*

This important state interest is furthered by HRS § 12-6(4) for that statute attempts to limit ballot access to serious indigent candidates. Stipulated Facts 7 & 8, *supra.*

---

[19] *See* Stipulated Fact 7, *supra*. Only serious candidates are desired for

> [r]ational results within the framework of our [political] system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success.

Lubin v. Panish, 415 U.S. 709, 715-16 (1974). By testing the seriousness of a candidacy, the state tests "the genuineness of a candidacy or the extent of the voter support of an aspirant for public office." *Id.* at 717. A serious candidacy is not confined to a certain economic class, for despite "this day of high-budget political campaigns," there have been impecunious but serious and successful candidates. *Ibid.*

Looking at the history[20] of HRS § 12-6, we observe that prior to the enactment of HRS § 12-6(4) there was no provision for the waiver of candidate filing fees for indigents.[21] HRS 12-6(4) was enacted to bring Hawaii's candidacy laws into line with the Supreme Court's decision in *Lubin, supra,* which held that

> *reasonable alternative means* of ballot access [must be made available to an indigent candidate, for] a State may not, consistent with [the Equal Protection Clause], require from an indigent candidate filing fees he cannot pay.

*Id.* at 718 (emphasis added); *cf. Williams v. Rhodes,* 393 U.S. at 32. The moving force behind HRS § 12-6(4), then, was not to single out indigents for adverse treatment but rather to release them from a condition precedent to candidacy that all other persons were required to fulfill.

But while indigents could not have afforded a filing fee, it would have been impermissible to allow indigents to run for office without facing some test of seriousness for this state had "an interest, *if not a duty,* to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Bullock,* 405 U.S. at 145 (emphasis added). In the petition requirement of HRS § 12-6(4), Hawaii chose to evaluate the seriousness of an indigent's candidacy in a manner expressly approved by the Supreme Court:

> [A] candidate who establishes that he cannot pay the filing fee required for a place on the . . . ballot may be required to demonstrate the "seriousness" of his candidacy by persuading a substantial number of voters to sign a petition in his behalf.

*Lubin, supra* at 718-19. Since the .5% signature requirement of HRS § 12-6(4) is a reasonable figure for indigent candidates to obtain, the inescapable conclusion is that HRS § 12-6(4) rationally furthers a legitimate state interest.

---

[20] History is a legitimate factor in determining the rationality of a state law. *See* Kotch v. Pilot Comm'rs., 330 U.S. 552, 557-58, 564 (1947).

[21] *Compare* HRS § 12-6 (1976) *with* HRS § 12-6 (Supp. 1975).

Plaintiff contends that HRS § 12-6(4) is an unreasonable method to test an indigent candidate's seriousness because indigent candidates have to satisfy an "inherently more burdensome" test of seriousness in soliciting petition signatures than non-indigent candidates have to satisfy in paying filing fees. He argues that while "a wealthy candidate[22] will have little trouble raising the fees," the indigent candidate must "canvass the community in search of support, a process calling for both [his] time and resources."

Why should a non-indigent candidate be spared the effort an indigent candidate must exert by the mere payment of money? Why shouldn't all candidates be uniformly required to obtain signatures of .5% of the registered voters?

If this state were pursuing identical interests in having petitions, HRS § 12-6(4), and in having filing fees, HRS § 12-6(2), those questions would be difficult to answer. But because different interests are promoted by petitions and filing fees, there is a rational basis for the different treatment of indigents and non-indigents.

In *Lubin,* the Supreme Court observed that

[a] majority of States have long required the payment of some form of filing fee, in part to limit the ballot and in part to have candidates pay some of the administrative costs.

*Id.* at 713 (footnote omitted). The use of filing fees to limit an election ballot to serious candidates is constitutionally valid if fees are required only of those candidates capable of paying.[23] *See id.* at 716-17; *Bullock, supra* at 134, 145-46, 149 ("nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees," *id.* at 149). In Hawaii the

---

[22] Plaintiff incorrectly uses the phrase "wealthy candidate" to describe those individuals able to afford filing fees. One who can pay the filing fee is only a non-indigent and may be just barely so.

[23] If candidate fees had been invalid *per se,* they would have been invalid for all, not just for those candidates unable to pay. *Compare* Lubin v. Panish, 415 U.S. 709 (1974)(candidate filing fees struck down only for indigents) *with* Harper v. Virginia Board of Elections, 383 U.S. 663 (1966)(state poll tax on voting struck down for all voters, those who could afford to pay as well as those who could not).

same two state interests are furthered by the filing fee required under HRS § 12-6(2).

First, filing fees serve to limit an election ballot to serious candidates. *See* Stipulated Facts 7 & 8, *supra*. The class of those individuals who can afford filing fees ($75.00 for the office sought in this case) covers a broad economic spectrum. For most such individuals the value of $75.00 is not so insignificant that they would throw it away in a frivolous candidacy. While the filing fee may not deter all non-indigent frivolous candidates from running for Congress, it serves to eliminate many if not most such candidates. It stands as a permissible means of excluding frivolous candidates for "no device can be conjured to eliminate every frivolous candidacy." *Lubin,* 415 U.S. at 715.

Since a state has much discretion in choosing the means to a legitimate state end or purpose, Hawaii's effort to eliminate non-indigent frivolous candidacies through a particular method should not be treated lightly. *See, e.g., McDonald v. Board of Election,* 394 U.S. 802, 809 (1969); *McGowan v. Maryland,* 366 U.S. 420, 425-28 (1961).

The second state interest served by filing fees is payment for some of the administrative costs of holding an election. HRS § 12-6(2) ("There shall be deposited with each nomination a fee on account of the expenses attending the holding of the . . . election"). This also is a legitimate state interest. *Bullock, supra* at 147. Because the presence of candidates creates, in part, the need to hold elections, it hardly seems unfair or irrational to have non-indigent candidates pay for some portion of election costs through filing fees. We observe that filing fees serve only to reduce election costs not to increase them, unlike the situation with petitions where signatures have to be checked and verified, thereby increasing election costs. Thus, two legitimate state interests are rationally furthered by the use of filing fees.

Under Hawaii law, then, there are two procedures to qualify for the ballot, each for a different class of candidates. The two procedures, however, do not serve the same state interests. For the class of indigents, a petition serves to test a candidate's seriousness; for the class of non-indigents, a

filing fee serves not only to test a candidate's seriousness but also to pay for part of the election costs. Therefore HRS § 12-6(4) and, as a corollary, HRS § 12-6(2)[24] both have a rational basis for their existence.

As political scientists, we may perhaps subscribe to the theory that election costs be borne by the government and that a uniform test of seriousness, petitions, be applied to all candidates. As justices of this court, however, we judge laws not by any political theory but by the Constitution. *Cf. Lochner v. New York,* 198 U.S. 45, 75-76 (1905) (Holmes, J., dissenting). We find no violation of equal protection in the .5% voter signature figure of HRS § 12-6(4). *Cf. Mathews v. Little,* 498 F.2d 1068 (5th Cir. 1974).

### Due Process Analysis

The remaining two issues raise possible due process violations, one procedural and the other substantive. The procedural issue asks the novel question whether this state had the duty to personally notify all indigent candidates of the date that HRS § 12-6(4) became effective. The answer is no. HRS § 12-6(4) became law on May 14, 1976, the day the

---

[24] The filing fees required of candidates for different offices are not proportional to the size of the constituency a particular official may represent. For example, the Mayor of the City and County of Honolulu represents a far larger constituency than any other mayor in the state, but a non-indigent candidate for Mayor of Honolulu pays a filing fee of $50.00, the same that candidates for other mayoralties pay. *See* HRS § 12-6(2). Thus, from one viewpoint there is an inequality insofar as the size of the filing fee for mayor fails to reflect the size of a mayor's constituency. But "there are various ways of viewing equality and . . . treating [candidates] equally in one respect always results in unequal treatment in some other respect." *Developments — Equal Protection, supra* note 8, at 1179. Fees under HRS § 12-6(2) appear to be based on the relative important of the office sought. From that viewpoint all non-indigent *mayoral* candidates are treated equally. As such, the fee schedule "has some 'reasonable basis,' [and] . . . does not offend the Constitution simply because [it] 'is not made with mathematical nicety or because in practice it results in some inequality.' " Dandridge v. Williams, 397 U.S. 471, 485 (1970). Inequality in a law does not violate equal protection if there is reasonable justification for it. *See* McGowan v. Maryland, 366 U.S. 420, 425-26 (1961). A legislature must have breathing room to experiment with.

Governor approved and signed it. Hawaii Const. Art. III, § 17; Act 106 § 7, 1976 Haw. Sess. Laws 180, 189. From that date, it applied to all indigent candidates. *Cf. Jacob Ruppert v. Caffey*, 251 U.S. 264, 301 (1910)(an act takes effect upon its passage); *Utermehle v. Norment*, 197 U.S. 40, 55 (1905) (mere ignorance of the law constitutes no defense to its enforcement).

We now consider the last issue whether HRS § 12-6(4) deprives indigents of substantive due process by preventing them from seeking elective office. Here, plaintiff's argument in favor of an affirmative answer consists of "generalities and assertions amounting to mere conclusions of law . . . . [and is] unsupported by citations of authorities." *Ala Moana Boat Owners v. State*, 50 Haw. 156, 158, 434 P.2d 516, 518 (1967). We decline his invitation to research the law for him and, since plaintiff has not met his burden of dispelling the presumption that a law is valid, we conclude that HRS § 12-6(4) does not violate substantive due process.[25] *Cf. id.* at 159, 434 P.2d at 518.

Having found no constitutional infirmity, we uphold HRS § 12-6(4)..

*John F. Schweigert and Lester L. Peetz* (American Civil Liberty Union of Hawaii Foundation, of counsel) for Plaintiff.

*Donn G. Kessler, Randall Y. Iwase, and Robin Campaniano,* Deputy Attorneys General, (*Ronald Y. Amemiya,* Attorney General) for Defendants.

---

[25] This issue is actually one of equal protection clothed in substantive due process form. *See* American Party of Texas v. White, 415 U.S. 767, 781-82 (1974); Storer v. Brown, 415 U.S. 724, 730 (1974); Lubin v. Panish, 415 U.S. 709, 713-16 (1974); Bullock v. Carter, 405 U.S. 134 (1972); Jenness v. Fortson, 403 U.S. 431, 440-41 (1971); Williams v. Rhodes, 393 U.S. 23 (1968). The equal protection issue whether a fundamental right was infringed has been analyzed in *Equal Protection Analysis,* Part 2., *supra.* Both plaintiff and defendants ably argued that issue.