MARIA M. HUSTACE, Plaintiff-Appellant, *v.* NELSON DOI as Lieutenant Governor and Chief Elections Officer of the State, and the State of Hawaii, Defendants-Appellees

NO. 7144

DECEMBER 29, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA,
and KIDWELL, JJ., and CIRCUIT JUDGE LUM
in place of MENOR, J., absent

OPINION OF THE COURT BY KIDWELL, J.

Plaintiff-appellant was a candidate for mayor of Maui County as a nonpartisan. After qualifying for inclusion on the ballot at the primary election, and before the primary election was held, appellant brought this action to test the provisions of the election law which established the criteria for inclusion of nonpartisan candidates on the ballot at the general election. Summary judgment confirming the validity of the election law was granted to the defendants on September 19, 1978, prior to the primary election, and this appeal was taken. By order of this court entered October 26, 1978, prior to the general election, the judgment was affirmed. This opinion explains the reasons for our order.

The challenged provision of the election law is contained in HRS § 12-41, which reads in full as follows:

§12-41 Result of election. The person or persons receiving the greatest number of votes at the primary or special primary as a candidate of a party for an office shall be the candidate of the party at the following general or special general election but not more candidates for a

party than there are offices to be elected; provided that any candidate for the board of education or for any county office who is the sole candidate for that office at the primary or special primary election, or who is only opposed by a candidate or candidates running on his own ticket and is not opposed by any candidate running on any other ticket, nonpartisan or otherwise, and is nominated at the primary or special primary shall, after the primary or special primary be deemed and declared to be duly and legally elected to the office for which he is a candidate at the primary or special primary regardless of the number of votes received by him. Any nonpartisan candidate receiving at least ten per cent of the total votes cast for the office for which he is a candidate at the primary or special primary, or a vote equal to the lowest vote received by the partisan candidate who was nominated in the primary or special primary, shall also be a candidate at the following election; provided, that when more nonpartisan candidates qualify for nomination than there are offices to be voted for at the general or special general election, there shall be certified as candidates for the following election those receiving the highest number of votes, but not more candidates than are to be elected.

The circuit court found that on September 5, 1978, there were 30,355 registered voters in Maui County, of which 19,022 were registered as Democrat, 2,516 as Republican, 105 as nonpartisan and 8,477 were undesignated. By statute, the date of the primary election was fixed as the first Saturday in October, or October 7, 1978. HRS § 12-22. It is not disputed that appellant had qualified herself as a candidate for the primary election and was entitled to a place on the ballot at that election. In this action, appellant sought to establish her entitlement to a place on the ballot for the general election, as a nonpartisan candidate for mayor, in the event that she should receive a majority of the nonpartisan votes cast in the primary election.

The record contains a deposition taken from the state director of elections, from which it appears that appellant was the only nonpartisan candidate for a county office in Maui

County. No Republican candidate had filed for mayor, the candidates for that office being two Democrats and appellant. Of nine council seats, only four were contested by Republicans and all remaining candidates were Democrats. Although nominations for state offices were also to be contested in the primary election, the record does not contain the names and party affiliations of the candidates for those offices. Since the judgment was entered before the primary election, we do not know from this record, nor is it relevant, how appellant fared in that election.

## I.

Appellant challenges the election law as discriminating between partisan and nonpartisan candidates and as imposing an undue burden on nonpartisan candidates seeking a place on the general election ballot. An understanding of the qualifications and procedures prescribed by the election law is a necessary background to consideration of these contentions.

Hawaii recognizes only one method of obtaining a place on the general election ballot by candidates for state and county offices. No person may be a candidate in the general election unless nominated in the immediately preceding primary. We are not concerned here with the qualification of candidates in the primary election, which was the issue addressed recently in *Nachtwey v. Doi,* 59 Haw. 430, 583 P.2d 955 (1978). A candidate in the primary election may seek nomination as the candidate of a political party, in which case he must certify that he is a member of the party and will carry out its platform, or may seek nomination as a nonpartisan with no requirement that affiliation with any political group be demonstrated. HRS § 12-3. A separate ballot is prepared for each party and one for nonpartisans. HRS §§ 12-21, -22. Each voter may receive only one of these ballots.

Any voter who has voted previously in a primary election (other than in a board of education race only) must select the ballot of the same party whose ballot he previously voted, or a nonpartisan ballot if he previously voted nonpartisan, unless

he has changed his party designation not later than 90 days before the primary election, or his party has become disqualified or he has reregistered. HRS § 12- 31.[1] Thus a nonpartisan candidate may seek votes only from voters who are designated nonpartisan or have not voted in a previous primary or have been freed from their previous affiliation by the disqualification of their party or by reregistration. As has been noted, 8582 (8,477 + 105) of the 30,355 registered voters in Maui County were in this category at the time appellant's action came before the circuit court.

In order to qualify as a party for which a primary ballot is prepared, a political group must either be a party which was on the ballot at the last general election and received sufficient votes to remain qualified, or it must have been organized as a new political party. Retention of qualification requires (ignoring minor details) that the party shall have presented candidates for at least one of the offices voted on by all the voters of the state or at least one of the offices of state senator, state representative or board of education, and that the party shall have received at least 10% of all the votes cast for any of the offices voted on by all the voters of the state or at least 10% of all the votes cast in at least 50% of the congressional districts, the state senatorial districts, the state representative districts or the state school board districts. HRS § 11-61. To qualify as a new party a group must, not later than 150 days prior to the primary election, present a petition containing the signatures of 1% of the registered voters of the state and must file the party rules. HRS § 11-62. The names of the officers of the central committee of the new party must be presented at the time of filing, and those of the county com-

---

[1] We do not consider the effect of the amendment of article II, section 4 of the Hawaii Constitution which was submitted for the approval of the electorate at the general election on November 7, 1978. The amended article reads as follows, the underlined language being added:

Section 4. The legislature shall provide for the registration of voters and for absentee voting[;] and shall prescribe the method of voting at all elections. Secrecy of voting shall be preserved[.]; *provided that no person shall be required to declare a party preference or nonpartisanship as a condition of voting in any primary or special primary election. Secrecy of voting and choice of political party affiliation or nonpartisanship shall be preserved.*

mittees not later than 120 days before the primary election. HRS § 11-64.

Nomination of the candidate of each party for the general election is determined by a plurality of the votes cast at the primary election for candidates for the particular office by voters who selected the party ballot, without any minimum requirement. In order to be nominated as a nonpartisan, a candidate must receive a plurality of the nonpartisan votes cast for candidates for the particular office and also must receive at least 10% of all of the votes cast at the primary election for the office for which he is a candidate, or a vote equal to that received by the partisan candidate for the office who was nominated by the lowest vote. HRS § 12-41. Appellant's attack centers on this provision, which is alleged to discriminate in favor of partisan candidates as against nonpartisan candidates and to place an undue burden on nonpartisan candidates.

## II.

We turn our attention first to the charge of discrimination, which invokes the guarantee of equal protection of the laws provided by the fourteenth amendment of the United States Constitution and by article I, section 4 of the Hawaii Constitution. We recently dealt with a similar contention, but in a different context, in *Nachtwey v. Doi, supra*. There the discrimination alleged was between indigent and non-indigent candidates in qualifying for the primary election, and the basis of the classification under attack was wealth. In the present case we are concerned with the different treatment accorded partisan and nonpartisan candidates in qualifying for the general election, and the classification under attack differentiates between candidates on the basis of political affiliation. In approaching a similar challenge, the United States Supreme Court said in *American Party of Texas v. White*, 415 U.S. 767, 780 (1974): "[W]hether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations against parties [not meeting the qualification criteria], their validity depends

upon whether they are necessary to further compelling state interests.'' To satisfy this standard, the Court said, the conditions imposed on a candidate's access to the ballot must be measures "reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways.'' 415 U.S. at 781.

Although expressed in terms of compelling state interests, it is clear that the standard so enunciated does not contemplate "strict scrutiny" of a challenged election law in the sense in which that term is sometimes used. We need not repeat here what has been said in *Nachtwey v. Doi, supra*. It is sufficient to refer to the explanation in *Storer v. Brown*, 415 U.S. 724 (1974). There the Court expressly rejected the contention, founded on strict scrutiny doctrine, that its cases dealing with candidate qualifications suggested a "rule [which] automatically invalidates every substantial restriction on the right to vote or associate.'' 415 U.S. at 729. Although the burden imposed on the candidate may have been determined to be substantial, the balancing of the burden against the state interests served thereby is a matter of degree.

It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a "matter of degree,'' *Dunn v. Blumstein, supra*, at 348, very much a matter of "consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.'' *Williams v. Rhodes, supra*, at 30; *Dunn v. Blumstein, supra*, at 335. What the result of this process will be in any specific case may be very difficult to predict with great assurance.

415 U.S. at 730.

As examples of the application of the balancing test, the Court in *Storer* referred to decisions in which a one-year residency requirement had been held invalid, *Dunn v. Blumstein*, 405 U.S. 330 (1972), but a residency requirement of 50 days had been upheld, *Marston v. Lewis*, 410 U.S. 679 (1973); and to decisions in which an 11-month waiting period after changing parties had been held valid as necessary to prevent inter-party raiding, *Rosario v. Rockefeller*, 410 U.S. 752 (1973), but a 23-month waiting period had been held not valid, *Kuspar v. Pontikes*, 414 U.S. 51 (1973). It is apparent that the "matter of degree" test which is enunciated in *Storer* is one which is to be applied with broad recognition of the practical problems to which the challenged regulation is directed.

Appellant is mounting primarily a facial challenge to the election law. We are given only the number and distribution of the registered voters as factual support for appellant's contention that the requirements imposed upon nonpartisan candidates unfairly discriminate in favor of partisan candidates. We do not know precisely the number of votes which appellant had to obtain in the primary election in order to satisfy the requirement that she poll 10% of the votes cast for the office of mayor. At the most, if all registered electors had voted in the primary, the vote requirement could have not have exceeded 2760 votes, even assuming that all remaining votes were cast for a single partisan candidate. Although voters registered as adherents of political parties would be unavailable to appellant, more than 8500 registered voters were entitled to select a nonpartisan ballot and to vote for appellant. But, as appellant points out, a partisan candidate need only poll sufficient votes to outnumber his nearest opponent on the ballot of his party and might secure a partisan nomination with many fewer votes than 10% of those cast for the particular office. We must consider whether this difference constitutes invidious discrimination.

Hawaii has provided alternative routes to the general election ballot for partisan and nonpartisan candidates. The candidate of a qualified party may obtain nomination by securing any number of votes, no matter how few, if they constitute a

plurality of the votes cast for candidates of that party, while a nonpartisan candidate must receive a minimum number of votes. That minimum number, however, can never be more than the number of votes which has been sufficient to nominate a partisan candidate for the same office in the same election. Appellant does not contend that the road to the general election ballot was easier for the candidates who in fact were competing with her in this election. The discrimination which appellant alleges is found in the fact that appellant would not have been subject to the minimum vote requirement if she had chosen to run as the candidate of a qualified party, in which event she would have needed only to obtain more votes than any other candidate competing for that party's nomination. It is contended that the system thus favors political parties as the channels to political office, and disfavors the nonpartisan route to office. The comparison, therefore, is not between the burdens on individual candidates but between the burdens borne in placing their candidates on the general election ballot by political groups which are organized as political parties compared with those borne by political groups which are not so organized.

As has been noted, a new party may obtain a place on the ballot in a primary election only by filing a petition signed by at least 1% of all the registered voters in the state. Once qualified, a party may retain its qualification only by polling at the last general election at least 10% of all the votes cast for an office voted on by all of the voters of the state or at least 10% of all of the votes cast for an office in 50% of the congressional districts, the state senatorial districts, the state representative districts or the state school board districts. The present record does not permit us to quantify these tests. Appellant has chosen to present her challenge upon a record which contains only the registration data for Maui County, and which does not enable us to determine precisely the number of voters whose support was required either to place a new party on the ballot or to retain the qualification of an established party for the primary election.

The purpose of providing and protecting an effective direct primary system is clearly a vital state objective, in pur-

suit of which a state may require a nonpartisan candidate to demonstrate substantial public support as an alternative to being nominated in one of the direct party primaries. *Storer v. Brown*, 415 U.S. at 733. Nevertheless, the state must provide feasible means for candidates of all parties and nonpartisan candidates to appear on the general election ballot and avoid conferring effective political monopolies on established parties. *Williams v. Rhodes*, 393 U.S. 23 (1968). However, "to maintain the integrity of the nominating process the State is warranted in limiting the voter to participating in but one of the two alternative procedures, the partisan or the nonpartisan, for nominating candidates for the general election ballot." *Storer v. Brown, supra* at 741.

We are dealing here with a facial challenge of the same nature as that considered in *American Party of Texas v. White, supra,* the difference being that there the discrimination alleged was between an established party and a new party, while here the discrimination alleged is between partisan and nonpartisan candidates. In both instances, however, the starting point is the burden of qualification placed upon the established party, since unless the party meets that burden its candidates will not qualify for the general election. We think the appropriate test was enunciated by the Court in *American Party,* when it said:

> Texas has provided alternative routes to the ballot . . . . and it is problematical at best which is more onerous in fact. It is sufficient to note that the system does not create or promote a substantial imbalance in the relative difficulty of each group to qualify for the ballot. 415 U.S. at 784, n.16.

The application of this test is illustrated by *Jenness v. Fortson*, 403 U.S. 431 (1971). The Georgia election law recognized as a qualified political party any party whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election. The candidates of such parties, selected in primary elections, became the parties' nominees at the general election. A nominee of any other political body or a nonpartisan candidate was required to file a nominating petition signed by 5% of the eligible voters. Votes

for write-in candidates were permitted. Prospective candidates challenged the validity of these provisions in a declaratory judgment proceeding similar to the present action. It was held that, facially, neither of the alternative routes available to a prospective candidate for getting his name on a general election ballot was inherently more burdensome than the other and there was not invidious discrimination between the candidates of established parties and other candidates.

In *Jenness*, the comparison was between qualification criteria consisting of percentages of votes cast at an election, on the one hand, and criteria consisting of percentages of eligible voters signing a petition, on the other. Notwithstanding the lack of commonality, the Court was able to weigh against each other the burdens imposed by the respective qualification criteria and to conclude from the face of the statute that they were inherently equivalent. In the present case, the comparisons are more direct. An established political party retains its qualification by polling 10% of various aggregations of the votes cast at the preceding general election. A nonpartisan candidate attains qualification by polling 10% of the votes cast for the office sought. We are unable to conclude that invidious discrimination is apparent in this comparison. If a new party is substituted for an established party in the comparison, the relevant requirement is that the new party obtain the signatures of 1% of the registered voters of the state in order to qualify itself for recognition in the primary election. The record does not tell us what this number would have been prior to this primary election, but we have no reason to believe that the number of such signatures which a new party was required to obtain was any less than the number of votes which appellant was required to obtain in order to qualify for the general election ballot. Which of these requirements was in fact more onerous would be an unwarranted speculation.

We will not attempt to consider whether the election law is so perfectly devised that there are no circumstances in which there might be a substantial imbalance in the relative difficulty of placing candidates on the general election ballot as between organized political parties and nonpartisan groups

and individuals. However, no substantial imbalance is apparent to us in the circumstances of this case. We conclude that the election law does not invidiously discriminate against appellant and her supporters and is a measure which, under the facts before us, serves vital state objectives which cannot be achieved equally well in significantly less burdensome ways. The election procedures applicable to appellant in the primary election under consideration here did not deprive her of equal protection of the law.

III.

The other arm of appellant's challenge requires that we consider whether the election law imposed conditions upon her opportunity to appear on the general election ballot which, although not discriminatory, were unduly burdensome. Here the validity of the minimum vote which appellant was required to obtain in the primary election must be adjudged in light of the rights of appellant and her supporters to associate for political purposes and to vote effectively. The "matter of degree" test enunciated in *Storer v. Brown, supra,* for separating restrictions that are valid from those which are invidious under the equal protection clause, is equally applicable in the present analysis. But somewhat different considerations enter into the evaluation of the restriction.

It is never possible, as the cases demonstrate, to view the burdens imposed on any aspiring candidate in total disregard of those placed on other candidates. On the other hand, a question may exist with respect to the validity of conditions placed by the state upon access to the ballot, even though rigorous equality is maintained among all prospective candidates. A tension exists between the interests of the state and the aspirations of candidates which must be resolved, whether or not the equal protection clause has any relevance.

The interests of the state have recently been placed in good perspective in the context of First Amendment rights:

If the States are to afford a republican form of government, they must by definition provide for general elections and for some standards as to the contents of the

official ballots which will be used at those elections. The decision of the state legislature to enact legislation embodying such regulations is therefore not in any sense an optional one; there must be some standards, however few, which prescribe the contents of the official ballot if the popular will is to be translated into a choice among candidates. Dealing thus by necessity with these issues, the States have strong interests in "limiting places on the ballot to those candidates who demonstrate substantial popular support," *ante,* at 96. They have a like interest in discouraging "splintered parties and unrestrained factionalism" which might proliferate the number of candidates on a state ballot so as to make it virtually unintelligible to the average voter.

*Buckley v. Valeo,* 424 U.S. 1, 292 (1976), opinion of Justice Rehnquist.

It has also been said that "a state has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies." *Bullock v. Carter,* 405 U.S. 134, 145 (1971). In *Jenness v. Fortson, supra,* the Court said:

There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot — the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

403 U.S. at 442. The compelling nature of these interests is also recognized in *Storer v. Brown, supra* at 732, *American Party of Texas v. White, supra* at 782 n.14, and *Lubin v. Panish,* 415 U.S. 709, 715-16 (1973).

We are faced with substantially the question considered in *Storer v. Brown, supra.* There the California statute required that a nonpartisan candidate, to obtain a place on the general election ballot, file a petition signed by voters not less in number than 5% of the total votes cast at the last general election. Those who had voted in the last primary election were disqualified from signing the petition of a nonpartisan candidate. The Court started with the proposition that a

state's interest in excluding candidates who do not possess substantial support is subject to constitutional limits recognized in *Williams v. Rhodes, supra.* The voter percentage required by California was viewed as not excessive on its face, in view of the Court's approval of a similar requirement in *Jenness v. Fortson, supra.* In *Jenness,* however, the voter pool from which a prospective nonpartisan candidate might draw included the entire electorate, without exclusion of those who had voted in the primary. The Court noted the possibility that the available pool of possible signers might be so reduced, by elimination of those who voted in the primary, as to make obtaining the requisite number of signatures by a nonpartisan candidate an impractical undertaking. Since this question could not be resolved on the record, the case was remanded for findings with respect to the extent of the burden imposed on nonpartisan candidates under California law. The ultimate question to be resolved by the District Court was stated: "[I]n the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirement, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742.

In *Storer,* the Court expressly affirmed the validity of the disqualification, as signers of an independent candidate's petition, of those who had voted a partisan ballot in the primary. The theoretical possiblity that this feature of the election law might freeze out all nonpartisan candidates was recognized by the Court, but was not given the effect of invalidating the petition signature requirement. The question was dealt with as a practical one, to be answered on the facts of the particular case. The burden of the signature requirement was directed to be appraised by the District Court in light, not excluding other relevant factors, of the interplay of the percentage of total voters required, the size of the pool of eligible voters and the time allowed to obtain signatures. The validity of the imposition by California of this burden, as finally evaluated in light of the circumstances actually faced by the prospective candidates before the Court, became "the inevitable question for judgment", to be resolved by applying

the standard of reasonable diligence.

A numerical test of what may be demanded of the reasonably diligent candidate, in terms of petition signature requirements, has not emerged from the cases. In *Storer*, the Court noted that it had not yet approved more than 5% of the eligible voter pool, but left the way open to the District Court to validate a higher percentage. Different considerations from those which are relevant in the appraisal of a petition signature requirement have a place in appraising the burden imposed by a requirement of a percentage of the vote in a primary election in which the nonpartisan candidate is permitted to participate. The nonpartisan candidate in a primary election under Hawaii law need not establish personal contact with petition signers and may address an appeal for support to the electorate generally. The nonpartisan candidate must obtain 10% of the vote cast at the primary only when that number is less than the vote polled by the weakest partisan candidate. No time limits or formal restrictions exist to hamper the appeal of the nonpartisan candidate for the support of those eligible to cast a nonpartisan ballot. The fact that the Hawaii election law, with insignificant exceptions, bars registered voters who have previously voted partisan primary ballots from supporting a nonpartisan candidate does not, on the authority of *Storer*, make facially unreasonable and invalid a requirement that a nonpartisan candidate obtain the support of an otherwise reasonable percentage of the voters. We consider that HRS § 12-41, in requiring appellant to obtain at least 10% of the votes cast for the office of mayor of Maui County at the primary election, on its face was not an unconstitutionally severe restriction on her obtaining a place on the ballot at the general election.

This conclusion, of course, transfers the inquiry into another area. The relevant question becomes whether, under the circumstances actually faced by appellant, the vote requirement was capable of satisfaction in the exercise of reasonable diligence. In contrast with *Storer*, we know from the record before us the size of the voter pool available to appellant from which to obtain the needed showing of voter support. In excess of 8500 registered voters could have voted a

nonpartisan ballot at the primary election. We do not consider that it was impracticable for appellant, in the exercise of reasonable diligence and if she possessed the requisite modicum of support as a candidate for the office of mayor, to obtain the votes of up to 2760 of these registered voters. The question whether the eligible voter pool had in fact been so diminished as to create an undue burden on appellant is thus answered by the record and the further factual inquiry ordered in *Storer* is not necessary in this case.

It was argued by appellant that keen voter interest in the contest for the Democratic nomination for governor made it unrealistic to assume that a substantial number of the undesignated voters would select a nonpartisan ballot and deprive themselves of participation in the major contest. Several possible flaws in this argument are apparent. It involves assumptions with respect to voter motivation which are essentially beyond proof. Any attempt to weigh evidence of prospective voter action would place the court in the role of a political pollster dealing with questions which seem outside the field of adjudication. Perhaps most significantly, the argument seems necessarily to attack the validity of any proscription of cross-over voting in primary elections. For the purposes of this opinion, it is sufficient to say that, giving full weight to the competition which may have existed for the available voters, the fact that appellant had the burden of persuading these voters to accept a nonpartisan ballot did not make it impracticable for appellant to secure sufficient votes to qualify for the general election. Her failure to do so demonstrated that she lacked the requisite "significant modicum of support."[2]

---

[2] A similar contention was rejected in *Hudler v. Austin,* 419 F. Supp. 1002 (D.C. Mich. 1976), *aff'd,* 430 U.S. 924, *rehearing denied,* 431 U.S. 925 (1977). There the state election law required that a new party, in order to qualify for a ballot position at the general election, both submit a petition signed by a requisite percentage of registered electors and also obtain the affirmative vote at the primary election of a requisite percentage of the voters. Voters who chose to endorse the new party at the primary thereby disqualified themselves from voting otherwise in the primary. Evidence was introduced to the effect that the voters who attended primary elections were major party adherents who were highly unlikely to surrender their partisan candidate votes merely to support the addition of a new party to the ballot. It was held

For the reasons stated above, we have concluded that HRS § 12-41, under the circumstances of this case, validly required appellant, in order to be placed on the general election ballot, to obtain the favorable vote of 10% of those voting for the office of mayor of Maui County in the primary election and that the judgment appealed from should therefore be affirmed as provided by our order of October 26, 1978.

*Ken T. Kuniyuki (Kuniyuki & Pang* of counsel) for Plaintiff-Appellant.

*Maria Sousa*, Deputy Attorney General, for Defendants-Appellees.

### DISSENTING OPINION OF RICHARDSON, C.J.

I respectfully dissent.

While I generally concur with the majority opinion's statements of law and facts, I disagree with the conclusion reached by the application of the law to the facts.

### FACTS

The appellant instituted this action to test the constitutionality of HRS § 12-41. She contends that it denied her equal protection of the laws and unduly burdened her right of association and the voters' right to vote by discriminating against her because she is a nonpartisan as opposed to a partisan candidate. The defendants were granted summary judgment.

HRS § 12-41 requires partisan candidates to win their primary election while nonpartisan candidates must win their

---

that the effort demanded of a new party to marshal support, including that of voters who would not otherwise have attended the primary, was not an undue burden on the new party and did not make compliance with the voter requirement impracticable. The conclusions reached in *Hudler v. Austin, supra,* and by ourselves in this case both depend on the existence of a pool of voters from which the necessary expression of voter support at the primary may practicably be obtained. If a sufficiently high percentage of the registered voters at the primary election for mayor of Maui County had been designated as party adherents and had thus been disqualified to receive a nonpartisan ballot containing appellant's name, that fact might have been sufficient to show that appellant could not practicably comply with the minimum vote requirement. That case is not before us, however.

primary election and either receive a vote equal to a winning partisan candidate or equal to 10 percent of the votes cast in the primary election to appear on the general election ballot.

The appellant was a candidate for mayor of Maui. There were 30,355 registered voters, of which 19,022 were registered as democrat, 2,516 as republican, 105 as nonpartisan and 8,477 were undesignated. Only nonpartisans and undesignated voters could vote for the appellant. HRS § 12-31.

The trial record does not reflect how many voters participated in the primary election or the number of votes the appellant needed to satisfy HRS § 12-41. The trial record also does not reflect that the 1978 democratic gubernatorial race was highly contested and probably caused many of the undesignated voters to choose a democratic ballot.

### ISSUE

Whether the trial court erred in granting summary judgment where the trial record is deplete of facts necessary to determine whether HRS § 12-41 unduly burdened the appellant's right of association and the voters' right to vote.

### DISCUSSION

*Williams v. Rhodes*, 393 U.S. 23 (1968) protected the First Amendment "rights of individuals to associate for the advancement of their political beliefs, and the right of qualified voters, regardless of political persuasion, to cast their votes effectively" by subjecting ballot access requirements to strict scrutiny. *Id.* at 30.

*Storer v. Brown*, 415 U.S. 724 (1974) and *American Party v. White*, 415 U.S. 767 (1974) ignored the traditional strict scrutiny test — where imposition of the test automatically invalidates the subject statute and the state is effectively prevented from showing a compelling state interest — and considered the state's interest in conducting effective elections. In pursuit of this objective the state may require candidates to demonstrate substantial public support but the requirements cannot be too restrictive. The test is whether the

candidate can appear on the general election ballot by exercising reasonable diligence. In applying the test the facts in the particular case must be considered.

In *American Party v. White, supra,* the challenged statute required a political party to secure two percent of the vote in the previous general election or file petitions signed by registered voters numbering at least one percent of the votes cast in that prior election. The statute was upheld because a reasonably diligent party could meet the requirements of the statute. This was supported by evidence that two of the plaintiffs had previously satisfied the statute and appeared on the ballot.

In *Storer v. Brown, supra,* the challenged statute imposed a five percent petition requirement for independent candidates and restricted the pool of eligible signers to those who had not participated in another party's primary election. The record was inadequate to decide the case. Thus, it was remanded with instructions to determine whether a reasonably diligent candidate could satisfy the statute.

In the instant case, the majority opinion states that the appellant could have satisfied HRS § 12-41 by exercising reasonable diligence because she only needed 2,760 votes from a pool of 8,582 voters (105 nonpartisans and 8,477 undesignated voters). The opinion admits: "We do not consider that it was impractical for the appellant . . . to obtain the votes of up to 2,760 of these registered voters." Yet, the opinion's statement of the law states that the reasonable diligence test must be applied with a view to the "facts in the particular case." Indeed, *American Party v. White, supra,* states: "The Constitution requires that access to the electorate be real, not 'merely theoretical.' " *Id.* at 783. Despite this established rule, the opinion concludes that remanding the case for further factual inquiry, as ordered in *Storer v. Brown, supra,* is not necessary.

The instant case was decided by summary judgment. Where there are disputed issues of material fact, summary judgment will be denied. *E.g., Creative Leisure International, Inc. v. Aki,* 59 Haw. 272, 580 P.2d 66 (1978). We do not know how many votes the appellant needed to satisfy the

requirements of HRS § 12-41 or how many of the undesignated voters were likely not to choose a nonpartisan ballot because of the democratic gubernatorial election. These facts are necessary to determine whether the appellant could satisfy HRS § 12-41 by exercising reasonable diligence. Therefore, the summary judgment should have been denied and the case remanded to decide these issues of fact.