**Theodorico ERUM, Jr.,
Plaintiff–Appellant,**

**v.**

**Benjamin J. CAYETANO \*, in his official capacity as Lieutenant Governor and Chief Election Officer of the State of Hawaii, Defendant–Appellee.**

No. 87–15156.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 17, 1988.

Decided Aug. 2, 1989.

---

\* Benjamin J. Cayetano is substituted for his predecessor, John Waihee, as Lieutenant Governor of the State of Hawaii. Fed.R.App.P. 43(c)(1).

**690**

Theodorico Erum, Kapaa, Hawaii, pro se.

Warren Price, III, Atty. Gen., State of Hawaii; Lawrence L. Hines, Steven S. Michaels, Deputy Attys. Gen., State of Hawaii, Honolulu, Hawaii, for defendant-appellee.

Before O'SCANNLAIN and TROTT, Circuit Judges, and KAY,** District Judge.

O'SCANNLAIN, Circuit Judge:

May the State of Hawaii regulate its elections by limiting access of nonpartisan candidates to the general election ballot and by imposing different requirements as between nonpartisan and partisan candidates? The district court held that as a matter of constitutional law, it could. We agree.

I

Theodorico Erum was a nonpartisan candidate for county office in 1984 and received ten votes out of 18,232 cast in the primary election,[1] or five one-hundredths of one percent. Because the number of votes Erum received represented less than ten percent of all votes cast and 205 votes less than the 215 votes the partisan candidate who qualified for the general election ballot with the least number of votes received, Erum was denied a place on the general election ballot.

Hawaii election law limits candidate access to the general election ballot for local and statewide elective office. Erum challenges in particular the Hawaii statute that prescribes access requirements for nonpartisan primary candidates, Hawaii Revised Statute § 12–41(b) (1985). To become a candidate on the general election ballot, a nonpartisan candidate must receive in the primary election either ten percent or more of the total votes cast for the office sought, or a total equal to or greater than the votes received by the least favored successful partisan candidate.[2] *Id.*[3]; *see also* Haw. Rev.Stat. § 11–112 (1985). Partisan candidates on the other hand make their way to the general ballot simply by receiving the greatest number of votes in the primary within their party and are not subject to a corresponding minimum vote requirement. Haw.Rev.Stat. § 12–41(a) (1985) [4]; *see also* Haw.Rev.Stat. § 11–112 (1985).

The state prepares a separate primary ballot for each qualifying political party and also one for all nonpartisan candidates. Haw.Rev.Stat. §§ 12–21, 12–22 (1985). No

** The Honorable Alan C. Kay, United States District Judge for the District of Hawaii, sitting by designation.

1. A duly registered Hawaii voter, Erum qualified for placement on the primary ballot by obtaining valid signatures of at least 15 registered voters eligible to vote for the Office of Councilmember of Kauai County. *See* Haw. Rev.Stat. §§ 12–4, 12–5.

2. Eight of twenty-six independent candidates have qualified for the general ballot under section 12–41(b) during the years 1976 to 1986. Those eight candidates represented ballot positions in the 1976 U.S. Senate race, the 1976 and 1980 race for mayor of Honolulu, and the 1982 races for U.S. Representative in both congressional districts.

3. Section 12–41(b) provides in full:
   Any nonpartisan candidate receiving at least ten per cent of the total votes cast for the office for which the person is a candidate at

the primary or special primary, or a vote equal to the lowest vote received by the partisan candidate who was nominated in the primary or special primary, shall also be a candidate at the following election; provided that when more nonpartisan candidates qualify for nomination than there are offices to be voted for at the general or special general election, there shall be certified as candidates for the following election those receiving the highest number of votes, but not more candidates than are to be elected.
Haw.Rev.Stat. § 12–41(b) (1985).

4. Section 12–41(a) states in relevant part: "The person or persons receiving the greatest number of votes at the primary or special primary as a candidate of a party for an office shall be the candidate of the party at the following general or special general election...." Haw.Rev.Stat. § 12–41(a) (1985).

person eligible to vote in the primary is required to state a party preference or nonpartisanship as a precondition to voting. Haw.Rev.Stat. § 12–31 (1985). Each voter is issued a primary ballot for each party as well as the primary ballot for nonpartisan candidates, but a voter is only entitled to vote on one such ballot. A voter may cast votes only for candidates of the same party or only for nonpartisan candidates. *Id.* "Cross-over" voting for different offices is not available.

On the day before the 1984 primary election, Erum filed a complaint *in pro per* in federal district court for the district of Hawaii, seeking to enjoin the Hawaii Lieutenant Governor from enforcing section 12–41. Erum alleges that the ten-percent vote requirement for nonpartisan candidates violates the first and fourteenth amendments in that it burdens rights to associate for political purposes and to vote effectively, and violates the equal protection clause in that it impermissibly discriminates both between partisan and nonpartisan candidates and among nonpartisan candidates.

The district court held that the statute did not violate Erum's constitutional rights and consequently entered an order grant-

ing the Lieutenant Governor's motion for summary judgment, from which Erum timely appeals.

## II

■ The Lieutenant Governor contends that Erum lacks standing to challenge the ten-percent requirement of section 12–41 because it did not come into play to exclude him in his 1984 bid to gain access to the general election ballot.[5] But Erum brought this action in his capacity as a registered voter of the State of Hawaii as well as in his capacity as an erstwhile and potentially future candidate. Candidate eligibility requirements implicate basic constitutional rights of voters as well as those of candidates. *Anderson v. Celebrezze*, 460 U.S. 780, 786–87, 103 S.Ct. 1564, 1568–69, 75 L.Ed.2d 547 (1983); *see also Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). Therefore, even if the Lieutenant Governor's contention is meritorious, Erum possesses standing to challenge the whole of section 12–41's ballot access restrictions in his capacity as a registered *voter. See Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 704, 7 L.Ed.2d 663 (1962).[6]

---

5. Although the election in which Erum participated has concluded, this case is not moot. Erum's action has as its basis a controversy that is "capable of repetition, yet evad[es] review." *See Storer v. Brown*, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974).

In addition, we reject the Lieutenant Governor's contention that because Erum allegedly was not "reasonably diligent" in seeking a seat on the Kauai County Council, he possesses an "absolute defense" to this action. In making this assertion, the Lieutenant Governor relies primarily on language the Supreme Court used in setting forth what it referred to as the "appropriate inquiry" in the context of reviewing the constitutionality of a state ballot access restriction. "[Can] a *reasonably diligent candidate* be expected to satisfy the [ballot access] requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Mandel v. Bradley*, 432 U.S. 173, 177, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977) (quoting *Storer*, 415 U.S. at 742, 94 S.Ct. at 1285) (emphasis supplied).

The *Storer* inquiry is geared toward determining whether reasonably diligent candidates *in general* have proceeded, or likely will proceed, to the general election ballot. Indeed, the

phrase "*a* reasonably diligent candidate" by its very wording suggests that the inquiry does not necessarily pertain to the specific candidate bringing the challenge. In addition, the Court has not analyzed subsequent cases in such a manner, even when it surely could have done so. *See, e.g., Munro v. Socialist Workers Party*, 479 U.S. 189, 192, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) (plaintiff received only nine one-hundredths of one percent of the overall primary vote). *See also McCarthy v. Tribbitt*, 421 F.Supp. 1193, 1197 (D.Del.1976). Finally, as we make clear in the next section, Erum possesses standing to challenge section 12–41 not only in his capacity as a candidate, but also as a voter.

6. The Lieutenant Governor also argues that the district court should have abstained from reaching the merits of Erum's constitutional claims under the doctrine which had its genesis in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Abstention is appropriate, according to the Lieutenant Governor, because of the dispute surrounding what the Hawaii statute outlining the mechanics for the formation of a "new" political party actually requires. Haw.Rev.Stat. § 11–62(a). But in ruling on the constitutionali-

## III

■ No "litmus-paper test" exists for evaluating constitutional challenges to ballot access restrictions.[7] *Munro v. Socialist Workers Party*, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986) (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). In ruling on such challenges, "there is 'no substitute for the hard judgments that must be made.'" *Anderson v. Celebrezze*, 460 U.S. 780, 789–90, 103 S.Ct. 1564, 1570–71, 75 L.Ed.2d 547 (1983) (quoting *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279). Instead, a court must weigh (1) the character and magnitude of the asserted injury to first and fourteenth amendment rights that the plaintiff seeks to vindicate; and (2) the precise interests put forward by the State as justifications for the burden imposed by its rule. *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570; *see also Storer*, 415 U.S. at 730, 94 S.Ct. at 1279. "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570.

In weighing these factors here, we rely in large measure on *Munro*, which upheld a Washington statute quite similar to Hawaii's section 12–41, one which also conditions certain candidates' access to the general election ballot on receiving a minimum number of votes in the primary. 479 U.S. at 199, 107 S.Ct. at 539.

With respect to the character and magnitude of the asserted injury to Erum's first and fourteenth amendment rights, we acknowledge that restrictions upon the access of independent candidates to the ballot impinge upon the fundamental rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively. *Anderson*, 460 U.S. at 787–88, 103 S.Ct. at 1569–70; *Illinois State Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct.

---

ty of section 12–41, we need not construe section 11–62(a). The political party and independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other. *Storer*, 415 U.S. at 745, 94 S.Ct. at 1286, *but see Stevenson v. State Bd. of Election*, 794 F.2d 1176, 1179 (7th Cir. 1986) (Easterbrook, J., concurring). Thus, because we need not interpret the requirements of section 11–62(a), or whether Erum can satisfy them, we forego abstention and reach the merits of Erum's constitutional claims.

7. In general, in assessing the constitutionality of a state election law under the first and fourteenth amendments, it is necessary initially to ascertain whether the law impinges upon the rights those amendments are designed to protect. *Eu v. San Francisco County Democratic Comm.*, — U.S. —, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989). If the challenged law operates to burden such rights, it can survive constitutional scrutiny only if the state establishes that it advances a compelling state interest and is narrowly tailored to serve that interest. *Id.* 109 S.Ct. at 1019–20.

In ballot access cases, however, such heightened scrutiny is not the rule. *See, e.g., Manifold v. Blunt*, 863 F.2d 1368 (8th Cir.1988); *Hatten v. Rains*, 854 F.2d 687, 693–96 (5th Cir.1988); *Rainbow Coalition v. Oklahoma State Election Bd.*, 844 F.2d 740 (10th Cir.1988). Indeed, not since 1979 has the Supreme Court invoked "strict scrutiny" to decide a ballot access case.

*Illinois State Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *see also Williams v. Rhodes*, 393 U.S. 23, 41, 89 S.Ct. 5, 15, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring). At other times, the Court has espoused such a level of scrutiny, only to abandon it upon application. *American Party v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer*, 415 U.S. 724, 94 S.Ct. 1274. And in its two most recent forays into the ballot access arena, the Court has forsaken even the appearance of allegiance to strict scrutiny by neglecting even to utter its name. *Anderson v. Celebrezze*, 460 U.S. 780, 788–90, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193–94, 107 S.Ct. 533, 536–37, 93 L.Ed.2d 499 (1986). In *Anderson*, the Court retained the elements that comprise strict scrutiny, but bypassed the tradiional procedure associated with the standard in favor of a weighing of factors. 460 U.S. at 789, 103 S.Ct. at 1570. In *Munro*, the Court declined to invoke expressly *any* level of scrutiny as an analytical standard. 479 U.S. 189, 107 S.Ct. 533; *see also id.* at 200, 107 S.Ct. at 540 (Marshall, J., dissenting). *Cf. also Eu*, 109 S.Ct. at 1026 (Stevens, J., concurring) (expressing reticence in non-ballot access case to embrace "as tests such easy phrases as 'compelling [state] interest' and 'least drastic [or restrictive] means.'" (quoting *Illinois State Bd.*, 440 U.S. at 188–89, 99 S.Ct. at 992–93 (Blackmun, J., concurring) (brackets in original)).

983, 990, 59 L.Ed.2d 230 (1979); *see also Munro*, 479 U.S. at 193, 107 S.Ct. at 536 (minor party candidate restrictions) (citing *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). Nevertheless, the effect on a candidate's constitutional rights is "slight" when a state affords a candidate easy access to the primary election ballot and the opportunity to wage a ballot-connected campaign. *Munro*, 479 U.S. at 199, 107 S.Ct. at 539. Here, Erum only had to submit a petition signed by fifteen eligible voters to gain access to the primary ballot. This certainly qualifies as "easy access." Therefore, in light of *Munro*, the burden the Hawaii statutory scheme imposes on Erum's constitutional rights is "slight."

As for Hawaii, the Lieutenant Governor has advanced essentially three major interests in support of section 12–41's ballot access restrictions, the first two of which have served to justify such restrictions in other contexts.[8]

First, the Lieutenant Governor sets forth Hawaii's interest in "combatting unrestrained factionalism," an interest which the Court held to be compelling and sufficiently weighty to justify California's one-year disaffiliation provision in *Storer*, 415 U.S. at 736, 94 S.Ct. at 1282. Second, he advances Hawaii's interest in "avoid[ing] voter confusion and overcrowded ballots," recognized in *Munro* as legitimate to support Washington's minimum vote requirement. *Munro*, 479 U.S. at 196, 107 S.Ct. at 538; *see also Clements v. Fashing*, 457 U.S. 957, 965, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982).

Erum contends that because differences exist between the Hawaii election law he challenges here and the Washington statutory scheme, reliance on *Munro* is misplaced. We address these differences one-by-one.

First, Erum points out that the Washington statute relates to minor-party candidates, while the Hawaii statute pertains to independent candidates. This difference is of little or no consequence, however. The Court has used ballot access restriction cases interchangeably whether the statute at issue restricts access by minor party candidates or nonpartisan candidates, or both. *See, e.g., Munro*, 107 S.Ct. at 537–38 (citing *Anderson* and *Storer*, both of which evaluated independent candidate restrictions).

Second, Erum points out that while the Washington statute operates in conjunction with a "blanket primary" statute that allows primary voters to vote for candidates of all parties regardless of office, Hawaii's statutory scheme prevents this type of "cross-over voting." Haw.Rev.Stat. § 12–31. A statute similar in effect to the Hawaii ban on "cross-over" voting, however, one which precludes those who voted in the party primary from signing an independent candidate's petition, has passed constitutional muster. *See American Party v. White*, 415 U.S. 767, 789–91, 94 S.Ct. 1296, 1310–11, 39 L.Ed.2d 744 (1974).

Third, Erum notes that the Washington statute requires that a minor party candidate only receive at least *one* percent of all votes cast for the office for which the candidate runs, not *ten* percent, as in Hawaii. The ten-percent mark Hawaii re-

---

**8.** We accord little, if any weight, to the third interest the Lieutenant Governor offers in support of the separate 10–percent rule requirement, however; that of "assuring support for a default winner." The Lieutenant Governor advances this interest based upon section 12–41's intersection with another of Hawaii's election law provisions. "Any candidate for county office who is the sole candidate for that office at the primary or special primary election, or who would not be opposed in the general or special general election by any candidate running on any other ticket, nonpartisan or otherwise, and who is nominated at the primary or special primary election shall, after the primary or spe-

cial primary election, be declared to be duly and legally elected." Haw.Rev.Stat. § 12–41(a). The Lieutenant Governor reads this provision in conjunction with the minimum vote requirement of section 12–41 to form the basis for his argument that "[t]he ten percent rule assures that a non-partisan 'elected' at the primary has at least that much support." We note in dismissing this interest that essentially the only time such a situation would arise is when only non-partisans run for a particular position and then in turn none of them receives at least 10 percent of the primary vote. Obviously, such a scenario is not likely to occur, if ever.

quires falls directly in the middle of percentages in the two major Court cases addressing numerical requirements—in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court upheld a five percent requirement, while in *Williams*, 393 U.S. 23, 89 S.Ct. 5, the Court struck down a fifteen percent requirement.[9] But, as noted above, the linchpin of *Munro* is not the smallness of the vote percentage required in the primary election. Rather, in upholding the Washington statute, the Court relied most heavily on the fact that while Washington—like Hawaii—imposes restrictions on access to the general election ballot, it also—like Hawaii—virtually assured access to the primary ballot.

Therefore, because Hawaii provides easy access to a ballot, resulting in only a "slight" infringement on Erum's constitutional rights, and because Hawaii advances what have been found to be compelling interests in other contexts, section 12–41 does not violate Erum's first and fourteenth amendment rights.[10]

## IV

To determine whether ballot access restrictions violate the equal protection clause, we examine (1) the character of the classification in question, (2) the importance of the individual interests at stake, and (3) the state interests asserted in support of the classification.[11] *Illinois State Bd.*, 440 U.S. at 183, 99 S.Ct. at 989.[12] We have already addressed the latter two elements and have determined that Erum's individual interests at stake are "slight" and Hawaii's interests sufficiently weighty to justify the ballot access restrictions Erum challenges. Thus, we need only investigate the character of the classifications in the Hawaii statutory scheme and assure ourselves that they are not the product of "invidious discrimination" to pass on the scheme's constitutionality. *American Party*, 415 U.S. at 781, 94 S.Ct. at 1306.

Two basic lines of inquiry exist relating to Hawaii's allegedly improper classifications. First, the statutory scheme impacts party candidates and nonpartisan candidates differently. Second, the statutory scheme creates the potential for disparate treatment among nonpartisan candidates.

Differences do exist in the conditions Hawaii imposes as between nonpartisan and partisan candidates on gaining access to the general election ballot. While the State requires a nonpartisan candidate to surpass a minimum primary vote threshold, it al-

---

**9.** Although *Jenness* and *Williams* are signature cases that do not involve primary minimum vote requirements, the difference between requiring primary votes to qualify for a position on the general election ballot and requiring signatures on a nominating petition is not one of "constitutional dimension." *Munro*, 479 U.S. at 197, 107 S.Ct. at 538. Thus, we view the two requirements as distinct, yet essentially equivalent, burdens for the purposes of constitutional analysis, and therefore look freely to nominating petition cases to inform that analysis.

**10.** Also lending support to the constitutional validity of section 12–41 is the fact that more than a few independent candidates have successfully overcome its restrictions. *See Storer*, 415 U.S. at 742, 94 S.Ct. at 1285. Indeed, Hawaiian election statistics strongly suggest that reasonably diligent candidates can and do succeed in getting placed on the general election ballot. *See* note 2, *supra*.

**11.** We note that substantial analytical overlap exists between those challenges brought to ballot access restrictions under the first and four-

teenth amendments and those brought under the equal protection clause. Indeed, the Court has relied on cases in the former category to decide those in the latter, and vice-versa. *See, e.g., Anderson*, 460 U.S. at 786 n. 7, 103 S.Ct. at 1569 n. 7 ("In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment"); *see also* G. Gunther, Constitutional Law at 823 (11th ed. 1985).

Nevertheless, while we follow the Court's trend of relying on both lines of cases to analyze either kind of challenge, we separate out the equal protection portion of our discussion for the purpose of preserving analytical clarity.

**12.** Though we cite to *Illinois State Bd.* to provide the basic framework for our equal protection analysis, we do not adopt its declaration that ballot access restrictions are subject to traditional "two-pronged strict scrutiny" for the reasons set forth in note 7, *supra*.

lows a partisan candidate to advance solely on the basis of winning his party's primary. *See* Haw.Rev.Stat. § 12–41(a).

As noted above, however, Hawaii does not possess an impermissible statutory scheme which serves to foreclose all but established party candidates from the ballot. *Williams v. Rhodes*, 393 U.S. 23, 35, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968); *see* note 2, *supra.* Rather, the State merely provides somewhat different alternative routes to partisan candidates and independent candidates for gaining access to the general election ballot. Where this is the case, neither route "can be assumed to be inherently more burdensome than the other." *Jenness*, 403 U.S. at 440–41, 91 S.Ct. at 1975.[13]

In this respect, we find analysis the Hawaii Supreme Court used in entertaining a similar challenge especially persuasive:

> In *Jenness*, the comparison was between qualification criteria consisting of percentages of votes cast at an election, on the one hand, and criteria consisting of percentages of eligible voters signing a petition, on the other. Notwithstanding the lack of commonality, the Court was able to weigh against each other the burdens imposed by the respective qualification criteria and to conclude from the face of the statute that they were inherently equivalent. In the present case, the comparisons are more direct. An established political party retains its qualification by polling 10% of various aggregations of the votes cast at the preceding general election. A nonpartisan candidate attains qualification by polling 10% of the votes cast for the office sought. We are unable to conclude that invidious discrimination is apparent in this comparison.

*Hustace v. Doi*, 60 Haw. 282, 292, 588 P.2d 915, 922 (1978).

The *Doi* analysis also holds for the different requirements Hawaii imposes for placement on the general ballot between so-called new party candidates and independent candidates. For example, new parties, before they can be recognized as such and have candidates appear under their name on the primary ballot, must successfully complete certain tasks. Haw.Rev. Stat. § 11–62. These differences are, like those upheld in *Jenness*, related to distinct processes, neither of which is inherently more burdensome than the other.[14] Thus, they do not run afoul of the equal protection clause.

The second focus of disparate treatment in the Hawaii statutory scheme relates to differences *among* nonpartisan candidates. That is, because of the operation of section 12–41, the chances for advancement to the general ballot of an independent candidate running in a race *without* a third party candidate are much less than those of an independent candidate running in a race *with* at least one third party candidate. Such disparity does not rise to the level of an equal protection violation, however. Instead, it is analogous to the vagaries of "plurality voting" that inhere in any primary system.

## V

The district court's summary judgment in favor of the Hawaii Lieutenant Governor is

AFFIRMED.

---

**13.** In *Jenness,* the Court held that Georgia's ballot access provisions—which require that an independent candidate file a nominating petition signed by five percent of the total electorate and that a partisan candidate win a majority of votes in a party primary—did not violate the equal protection clause. *Id.* at 440, 91 S.Ct. at 1975.

**14.** In addition, the presence of such "new party" candidates actually enhances the independent candidate's chances of getting on the general ballot; if only established party candidates run, the nonpartisan candidate likely will have to meet the 10% threshold.